# EXHIBIT 1

**IN THE MATTER OF THE ARBITRATION ACT 1996**

**AND**

**AND IN THE MATTER OF AN LMAA ARBITRATION**


**BETWEEN**

**ADM INTERMARE – A DIVISION OF ADM INTERNATIONAL SARL**

**Disponent Owner / ADM**

**AND**

**GLOBAL AMERICAN TRANSPORT LLC**

**Charterer / GAT**


**MV EASTERN HAWK**

**CP dated 22 September 2023**


**FINAL AWARD**

**Introduction**

1.      By a charterparty dated 22 September 2023 (the "Charterparty"), ADM INTERMARE, a division of ADM International SARL, (the "Owner") agreed to let and Global American Transport LLC (the "Charterer") agreed to hire the MV "EASTERN HAWK" (the "Vessel") for a period charter of six to eight months.  The Charterparty was agreed by recap and was based on an amended NYPE form with additional clauses.


**The arbitration clause and constitution of the tribunal**


2.      Clause 18 of the recap provided for English law and arbitration, and clause 70 of the additional clauses incorporated the BIMCO Dispute Resolution Clause.


3.      Disputes arose between the parties for the determination of which the Owner appointed me, the undersigned George Eddings, of 8, Mary Ann Gardens, London

SE8 3DP.  The Owner was represented by Hill Dickinson LLP, solicitors; the Charterer was not represented.

4.    Notice of my appointment was given on 26 November 2024 by Hill Dickinson, who quoted the BIMCO Dispute Resolution Clause and the Charterer was put on notice that if they failed to appoint an arbitrator within 14 days, I would be appointed as sole arbitrator.  The Charterer failed to appoint an arbitrator and on 11 December 2024 I was appointed sole arbitrator.

5.    I am satisfied that I was properly appointed as sole arbitrator and that I have jurisdiction to determine the Owner's claims in this reference.

**The submissions**

6.    On 8 January 2025, Hill Dickinson served claim submissions on behalf of the Owner, claiming a balance of hire in the sum of US$78,654.47 and US$200,000 for bunkers supplied to the Vessel at Hong Kong during the currency of the Charterparty by a supplier called Bunker Partner OU from Estonia.

7.    The Owner exhibited various documents with the claim submissions.  These included correspondence between the parties regarding the Owner's Final Hire Statement, and messages from the Charterer which did not "disclaim" any of the outstanding balance of US$78,654.47 but referred to cash flow problems experienced by the Charterer and requested the Owner to consider a repayment plan.

8.    In relation to the bunkers, the Owner relied on clause 2 of the NYPE form which stipulated that the Charterer was to provide and pay for the fuel under the Charterparty, and exhibited copies of an Order Confirmation and Bunker Delivery Note, together with confirmation of balances, signed by the Charterer, recording an open balance in Bunker Partner's favour of US$268,569.52, being an original amount due of US$368,569.52 less the Charterer's  part payment of US$100,000.

9. Given the Charterer's non-payment for the balance due in respect of the bunkers, Bunker Partner wrote to the parties, to the registered owner of the Vessel and to the master threatening to arrest the Vessel if the balance was not paid. When the Owner pressed the Charterer to settle the debt for the bunkers, the Charterer again cited cash flow difficulties, and stated –

> "IN CASE OWNERS, TO AVOID ANY ARREST AND MITIGATE COSTS, CAN SETTLE PART OF IT, AS WILL PROBABLY BE ASKED BY SUPPLIER, GAT WILL ARRANGE WITH FHS".

10. As the Vessel remained on charter by the Owner from the registered owner and was en route to Fujairah where the Vessel was threatened with arrest by Bunker Partner, the Owner entered into direct negotiations with Bunker Partner, and settled their claim by paying them US$200,000 to avoid the arrest of the Vessel. The settlement was in full and final settlement of any claims by Bunker Partner against the Vessel, the registered owner and/or the Owner, and provided that Bunker Partner could puruse their shortfall against the Charterer.

11. The Owner then pressed the Charterer to settle their combined claim of US$278,654.47 for the final hire balance and bunker payment. Again, the Charterer responded "*not disclaiming any of the outstanding*" but citing cash flow problems and asking the Owner to make a proposition for a repayment plan.

12. On 14 February 2025, the Charterer served defence submissions drafted by their in-house legal team.

13. The Charterer admitted the balance of hire account in the sum of US$78,654.47 but submitted that the refusal of the Owner to agree a repayment plan unless the Charterer *"put some money on the table"* breached a legal obligation of the Owner to mitigate their loss. The Charterer submitted that their invitation to the Owner to propose their own payment plan amounted to good faith on the Charterer's part, and that the Owner's reaction that they were being used as the Charterer's credit

facility was libellous.  The Charterer submitted that the tribunal should impose on the parties an obligation to negotiatea payment plan within a specific period.

14.    As to the bunker claim, the Charterer submitted that the Owner had failed to show that Bunker Partner had a lien over the Vessel, that the bunker supplier's claim would have been against the Vessel itself and that the Owner's settlement agreement appeared to have been negotiated on behalf of the registered owner, without any proof that the Owner was authorised to settle for the registered owner. Further that the proof of payment was insufficient as it was only the remittance instruction, not the SWIFT copy.

15.    Hill Dickinson served reply submissions on 19 February 2025 re-emphasising the fact that the debt for the balance of hire was admitted, and submitting that mitigation was relevant to a claim in damages, whereas here the claim was for an admitted debt, so that the Owner had no obligation to reduce or delay the payment to them. Further, even if mitigation was relevant, the Charterer had failed to prove any failure to mitigate.  In any event, the Owner had invited the Charterer to put money on the table.

16.    As to the claim in libel, the Owner submitted that any comment had not been published but confined to correspondence between the parties; and the Charterer could not point to any damage having been suffered.

17.    In regard to the bunker claim, the Owner submitted that the Charterer did not dispute that the debt was owed by them to Bunker Partner, that the relevance of the registered owner was that this was an alternative route for the bunker supplier to secure payment and that the Charterer had themselves invited the Owner to settle with the bunker supplier.  The Owner also referred to an exhibit of the SWIFT remittance.

**My findings**

18.    I accept the submissions of the Owner.

19.     I do not see that mitigation has any relevance in the case of an admitted debt and find that the Owner succeeds in its claim for the final hire balance in the sum of US$78,654.47.  There is no obligation on a creditor to accept a payment plan, and the Owner is perfectly justified in pursuing an award.  Further I do not find that the Owner's claim is libellous or has caused any damage to the Charterer.

20.     In relation to the bunker claim, it is well known in the maritime world that bunker suppliers have a direct claim against a vessel for the supply of bunkers in many jurisdictions, even though the supply has been ordered by a charterer.  Even if the Vessel had not been arrested in Fujairah, the Owner would inevitably have faced an indemnity claim by the registered owner after an arrest elsewhere, and, if the Vessel had been arrested, the indemnity claim would have been increased by the costs of the arrest, and the delay to the Vessel, all of which could well have been included by the registered owner.  I find that the steps taken by the Owner to settle the bunker claim direct with the bunker supplier, to avoid a claim against the Vessel were reasonable steps in mitigation of a potential indemnity claim against them, and, indeed, were steps suggested by the Charterer itself.  I therefore find that this head of claim also succeeds, and I accept the proof of payment by the Owner.

**Interest**

21.     The Owner submitted that I should award interest at such rate that I found appropriate from 8 November 2024 on US$78,654.47 (being the date of the final hire statement) and from 25 November 2024 on US$200,000 (being the date when the Owner paid Bunker Partner).  I accept that the Owner is entitled to interest for the periods claimed, and I consider 6% to be the appropriate rate.

**Costs**

22.     I see no reason to depart from the general principle that costs should follow the event and, in the circumstances, where the Owner has succeeded, I have awarded the Owner their costs to be assessed in accordance with s.63(5) of the Arbitration

Act 1996.  Further, the Owner shall be entitled to interest on their costs at the rate of 6% (six percent) per annum and pro rata compounded at three-monthly rests, from the date of this Award until the date of payment.

**Dispositive award**

23.   Having taken upon myself the burden of this reference and having carefully and conscientiously read and considered the submissions and documents put before me and the evidence and arguments presented in the reference and given due weight thereto, I, the undersigned George Eddings, **DO HEREBY MAKE, ISSUE AND PUBLISH** this my **FINAL AWARD** as follows.

24.   **I FIND, HOLD, AWARD AND DIRECT** that the Charterer shall forthwith pay to the Owner the sum of US$278,654.47 (Two hundred and seventy eight thousand, six hundred and fifty four United States dollars and forty seven cents) together with interest thereon at the rate of 6% per annum, compounded at 3-monthly rests, from 8 November 2024 on US$78,654.47 and from 25 November 2024 on US$200,000 until the date of payment.

25.   **I FURTHER AWARD AND DIRECT** that the Charterer shall bear their own costs of this reference and the Owner's costs (the latter to be assessed by me if agreement cannot be reached on the basis set out in section 63(5) of the Arbitration Act 1996) together with interest thereon at the rate of 6% (six percent) per annum and pro rata, compounded at three monthly rests, from the date of this  Final Arbitration Award until the date of payment in full.

26.   **I FUTHER AWARD AND DIRECT** that the Charterer shall bear and pay the sum of £2,125 (British pounds sterling Two Thousand, One hundred and Twnety Five) being the Tribunal's fees **PROVIDED** that if the Owner shall in the first instance have paid any part of those fees they shall be entitled to the immediate reimbursement by the Charterer of the sum so paid together with interest thereon at the rate of 6% per

annum and pro rata, compounded at three monthly rests, from the date of payment by the Owner to the date of reimbursement by the Charterer.

**GIVEN** under my hand in London, the seat of this arbitration, this 26th day of February 2025.

…………………………………………

George Eddings

# EXHIBIT 2

**Cansu Yildirim**

---

**Von:** handy@frachtcontor.de <handy@frachtcontor.de>
**Gesendet:** Freitag, September 22, 2023 5:16 PM
**An:** Werner, Jürgen <Juergen.Werner@adm.com>
**Betreff:** [EXTERNAL] M/V EASTERN HAWK // acct GAT // CLEAN RECAP FOR C/P DD. 22 SEPTEMBER 2023

Doc-No. 22699347  22/SEP/2023 (FRI)  17:15  (+0200)  PL


Jürgen, Sven / Peer


Moin Moin,


many thanks your support leading to this fixture, appreciated! Pls find below clean recap as agreed. Nice we!


M/V EASTERN HAWK // acct GAT // CLEAN RECAP DD 22/09/2023
====================


WARRANTIES/GUARANTEES QUESTIONNAIRE: attached


M/V EASTERN HAWK

-

MV EASTERN HAWK - VESSEL DESCRIPTION

MV EASTERN HAWK BLT NOV 2020 IMABARI SHIPBUILDING
CLASS                                    :    NK
DESCRIPTIVE NOTE                  :    STRENGTHENED FOR HEAVY CARGO LOADING WHERE HOLDS NOS. 2 & 4
                                              MAY BE EMPTY
FLAG                                      :    SINGAPORE
LENGTH OVERALL                     :    179.97 M
BREADTH (MLD.)                      :    29.80 M
SCANTLING DRAFT (MLD.)          :     ABT. 10.54 M
DEAD WEIGHT   (AT SCANTLING DRAFT)    :    ABT. 37,520 MT
TPC                           :    48,6
NO. OF CARGO HOLDS/HATCHES        :    FIVE (5)/FIVE (5)
HOLD CAPACITY (GRAIN)            :    46,995 M3
HATCH SIZE                         :    NO.1            ABT. 15.87 M (L) X ABT. 17.16 M (B)
                                   NO.2 - 5        ABT. 20.04 M (L) X ABT. 20.02 M (B)
HATCH COVER                       :    END FOLDING TYPE, WEATHERTIGHT STEEL HATCH COVER
DECK CRANE                        :    ELECTRO-HYDRAULIC DRIVEN, SINGLE DECK CRANE
                                   4 X 30.5MT SWL

```
SCRUBBER FITTED                         :   YES, OPEN LOOP
A60/CO2:                        :    FITTED
FULLY LOGS FITTED:                      :    YES
```
SPEED / CONSUMPTION
IN GOOD WEATHER CONDITION I.E. IN WINDS UP TO BEAUFORT FORCE 4 AND HEIGHT OF SWELL UP TO DOUGLAS SCALE 3, NO ADVERSE CURRENT.
```
BALLAST CONDITION           LADEN CONDITION
ABT. 14.3 KNOTS             ABT. 13.7 KNOTS
```
CONSUMPTION AT SEA :
FOR MAIN ENGINE AT SEA: ABT 21.9MT VLSFO
FOR AUX ENGINE AT SEA : ABT 1.7MT VLSFO + ABT 0.2MT LSG

ECO SPEED/CONSUMPTION (GURANTEED)
```
BALLAST CONDITION   ABT 13.00 KNOTS      ABT 15.0 MT
LADEN CONDITION     ABT 12.00 KNOTS      ABT 14.4 MT
```
CONSUMPTION AT SEA:
FOR AUX ENGINE AT SEA : ABT 1.7MT VLSFO + ABT 0.2MT LSG

IN PORT CONSUMPTION :
```
WHEN IDLE                   : ABT 2.6MT VLSFO + ABT 0.2MT LSG
WHEN WORKING (24 HOURS)         : ABT 4.6MT VLSFO + ABT 0.4MT LSG
```

ALL FIGURES "ABOUT"


UPDATED  BQ - ATTACHED


PLS CLARIFY IF VESSEL HAS AHL.  -  CONFIRM AHL FITTED



M/V EASTERN HAWK

1.PLS PROVIDE FULL TCD ON ABT BASIS AND PLS DELETE WOG, INCLUDING FULL/ECO SPEED AND ON DECK CUBICS FOR LOG CARGOES (IF APPLICABLE)
2.PLS PROVIDE BALTIC QUESTIONNAIRE  - attached
3.PLS PROVIDE LAST 10 CARGOES AND LAST 10 PORTS  - as per BQ
4.PLS PROVIDE LATEST ITINERARY  - vssl in Shipyard Zhoushan ETC 26 Sep23 agw
5.PLS PROVIDE PHOTOS ON VESSEL HOLDS  -
6.
7.PLS PROVIDE LAST DD/SS DATES - as per BQ
8.
9.PLS CONFIRM VESSEL CAN LOAD 2X25 COILS  - confirm as per description/CP
10.PLS CONFIRM FOR LOGGERS IF FF LOGGER IF COLLAPSIBLE STANCHIONS AND THEIR HEIGHT.  - Confirm FF logger




ATTACHED

·CHARTS BG/FIXLIST
·WARRANTIES/GUARANTEES QUESTIONNAIRE (TO BE PREPARED BY OWNERS) attached
·GAT KYC FORM  - SENT VIA SEPERATE MAIL TO legal@gatransportllc.com


FOR


1) CHARTERERS:

GLOBAL AMERICAN TRANSPORT LLC
77 WEST WACKER DRIVE, 45 TH FLOOR
CHICAGO, ILLINOIS, 60601, USA
T:  +1 312 3129593 (24HRS)
E:   OPS@GATRANSPORTLLC.COM
W:

CHARTS CLUB: THE LONDON CLUB

PERFORMANCE GTEE BY EMPTOR SHIPPING TO BE SENT SEPERATELY


2) OWNERS:

HEADOWRS:
GOODWILL MARITIME PTE. LTD.
3 ANSON ROAD #08-01
SPRINGLEAF TOWER
SINGAPORE 079909

DISPONENT OWNERS (CP COUNTERPART):
ADMINTERMARE, A DIVISION OF
ADM INTERNATIONAL SÀRL

A ONE BUSINESS CENTER
LA PIÈCE 3
CH-1180 ROLLE • SWITZERLAND
REGISTERED IN SWITZERLAND N° CH-550.1.052.13-9
VAT N° CHE-113.903.886 TVA

3) DELIVERY: DLOSP EX ZHOUSAN SHIPYARD

4) LAY/CAN : 0001 HRS 26 SEPTEMBER 2023 / 2359 HRS TO 30 SEPTEMBER  2023, BASIS LOCAL TIME.

5) PERIOD & TRADING:
ABT 6 TO ABT 8 MONTHS (ABT +/- 15 DAYS) WORLDWIDE TRADING, SUBJECT TO AGREED TRADING EXCLUSIONS, WITH LAWFUL, NON-DANGEROUS AND NON-HAZARDOUS CARGOES IN BULK, ALWAYS VIA SP(S), SB(S), SA(S), PLACE(S), TRANSIT(S), ALWAYS AFLOAT (EXCEPT NAABSA PORTS),

6) REDELIVERY:
SINGAPORE/JAPAN RANGE
+ BOSTON/BAHIA BLANCA RANGE
+ BALIC/CONT MED RANGE INCL BSEA

7) HIRE:
USD 12300 (INCLUDING SCRUBBER BENEFIT TO CHARTS 11%), PDPR INCLOT PAYABLE EVERY 15 DAYS IN ADVANCE. FIRST HIRE PAYABLE WITHIN THREE BANKING DAYS AFTER VESSEL'S DELIVERYY AND CHARTERERS' RECEIPT OF OWNERS' HIRE STATEMENT VIA E-MAIL.

OWNERS BANKING DETAILS:

ACCOUNT NO:  30744326
BENEFICIARY NAME:  ADM INTERNATIONAL SARL
ACCOUNT CURRENCY:  USD
BIC / SWIFT: CITIUS33
ABA:
BANK NAME 021000089
CITIBANK, N.A.
BRANCH: NEW YORK
ADDRESS1: 111 WALL STREET
POSTAL CODE: 10043
CITY: NEW YORK
COUNTRY: UNITED STATES

8) BUNKERS CLS:
BUNKERS EXPECTED ON DELIVERY AS ON BOARD TO BE ABOUT 840 MTONS HSFO(3,5PCT) AND ABOUT 70 MTONS LSMGO. BUNKERS ON RE-DELIVERY TO BE ABOUT SAME QUANTITIES AS ON DELIVERY.
USD 535 PER MT FOR HSFO, USD 945 PER MT FOR LSMGO. (21TH SEPT 2023 PLATTS PRICE AT ZHOUSHAN, PRC). SAME PRICE AS ON DELIVERY ALSO APPLYING ON REDELIVERY.
VALUE OF BUNKERS ON DELIVERY TO BE PAID TOGETHER WITH 1ST HIRE.

IT IS UNDERSTOOD AND AGREED THAT CHARTERERS COMPENSATE 89% SCRUBBER BENEFIT FOR ALL HSFO QUANTITY CONSUMED FROM DELIVERY UNTIL REDELIVERY.

9) ILOHC:
CHARTERERS TO PAY ON REDELIVERY A LUMPSUM OF USD 5000,- IN LIEU OF HOLD CLEANING EXCL REMOVAL AND DISPOSAL OF DUNNAGE, DEBRIS, LASHING MATERIALS

10) CABLING/VICTUALLING:
CHARTERERS TO PAY USD 1,500.00 PER 30 DAYS OR PRO RATA FOR VICTUALLING AND COMMUNICATIONS.

11) VSL'S HOLDS ON ARRIVAL FIRST LOAD PORT:
VESSEL ON  ARRIVAL FIRST AND LOAD PORTS TO BE READY TO RECEIVE ANY PERMISSIBLE CARGO EXCEPT ALUMINA, SODA ASH OR ANY OTHER CARGO REQUIRING HOSPITAL CLEAN HOLDS (HOLDS WILL BE BLASTED AND GRAINCLEAN. ALUMINA ETC FOR CHRTS RISK) TO CHARTS/SURVEYORS SATISFACTION. HER HOLDS/CARGO COMPARTMENTS TO BE CLEAN, FRESH WATER WASHED, DRY, FREE OF LOOSE RUST AND/OR SCALE AND CARGO RESIDUES/STAINS READY IN ALL RESPECTS TO THE SATISFACTION OF THE SURVEYOR(S) AND/OR SUCH OTHER RECOGNIZED LOCAL AUTHORITY OR OFFICIAL AS LOCAL REGULATIONS OR SHIPPERS/CHARTS MAY REQUIRE TO RECEIVE PERMITTED CARGO  WHICH THE VESSEL MAY BE REQUIRED TO LOAD. IF ON PRESENTATION FOR LOADING AT FIRSTLOADING PORT/S THE VESSEL SHOULD FAIL TO PASS THE INSPECTION, THEN ALL DIRECTLY RELATED EXPENSES/TIME UNTOL SHE IS PASSED INCLUDING CLEANING/FUMIGATING AND/OR COST OF LABOUR STANDING BY (MAX 1ST SHIFT)TO BE FOR OWNERS ACCOUNT, AND THE VESSEL BE OFFHIRE FROM TIME OF REJECTION AT LOAD PORT UNTIL IT IS IN ALL RESPECTS READY TO LOAD AND SURVEY PASSED AND ACCEPTED BY SHIPPERS/CHARTS. PRO RATA PRINCIPLE TO BE APPLICABLE IF LOADING ACCORDINGLY ALLOWED.

CHARTERERS OPTION TO PERFORM WATER HOSE TESTING PRIOR LOADING BY INDEPENDENT SURVEYOR ON THE HOLDS FOR WEATHER TIGHT INTEGRITY. SHOULD VESSEL FAIL TO PASS WATER HOLDS' TESTING, OWNERS TO REPAIR HOLDS AS SOON AS POSSIBLE AND RISK AND EXPENSE TO BE FOR OWNERS ACCOUNT, VESSEL TO BE OFF-HIRE FROM THE TIME OF FAILURE UNTIL HOLDS ARE PASSED.

12) BILL OF LANDING AND LOI:
AS PER CP

13) INTERCLUB AGREEMENT:

AS PER CP


14) WEATHER ROUTING:
AS PER CP


15) GMT TIME:
FOR THE PURPOSE OF COMPUTING HIRE PAYMENTS, THE TIME FOR DELY AND REDELY SHALL BE ADJUSTED TO G.M.T.


16) QUARANTINE
AS PER CP


17) ADDING OFF-HIRE
SHOULD THE VESSEL PLACED OFF-HIRE FOR LONGER THAN 6 HOURS PER OCCASION DURING THE CURRENCY OF THIS C/P FOR ANY REASON, CHARTS HAVE THE OPTION OF ADDING ALL OR PART OF SUCH OFF-HIRE PERIOD TO THE ORIGINAL PERIOD. IF THE VESSEL IS PLACED OFF-HIRE FOR MORE THAN 30 CONSEQUTIVE DAYS, THEN CHARTS HAVE THE OPTION OF CANCELLING THIS C/P.


18) GOVERNING LAW:
ENGLISH LAW, LONDON ARBITRATION TO BE APPLIED.


19) COMMISSIONS: ADDRESS COMMISSION OF 3.75% DUE TO CHARTERERS, 1.25% PAYABLE TO FRACHCONTOR BY OWRS


20) FURTHER DETAILS/TERMS/CONDITIONS/, CARGO/TRADING EXCLUSIONS   - AS PER CP ATTACHED


REG DIRTY CARGOES TO READ AS FOLLOWS:

FOR 6-8M CAN DO 3 DIRTY CARGOES. IN ADDITION: DECK CARGO EXCPT LOGS TO BE CHECKED ON A CASE BY CASE BASIS.

FOR THE DURATION OF 6-8M THE CHARTERERS ARE ALLOWED TO CARRY A MAXIMUM OF 3 (THREE) DIRTY CARGOES FROM THE BELOW LIST HOWEVER SUCH DIRTY CARGOES ARE NOT TO BE CARRIED ON CONSECUTIVE VOYAGES OR ON THE FINAL VOYAGE BEFORE REDELIVERY:
A) MAX 2 CARGOES OF PETROLEUM COKE
B) MAX 1 CARGOES OF SALT
C) MAX 2 CARGOES OF CEMENT IN BULK OR CEMENT CLINKER
D) MAX 1 CARGO OF SULPHUR
E) MAX 1 CARGO OF SCRAP



ETS + CII CLS WORDING AMICABLY MUTUALLY DISCUSSED AND AGREED ONCE IT BECOMES DUE



SCRUBBER CLS:


[SCRUBBER CLAUSE (WORDING AS PER BTB CP)]


1.   THIS VESSEL IS FITTED WITH OPEN LOOP TYPE SOX SCRUBBER (HEREINAFTER "SCRUBBER")).


2.   BUNKER SAVING PROFIT SHARE FORMULA AS FOLLOWS:

A) WHERE THE CHARTERERS ARE ABLE TO STEM HEAVY FUEL OIL (3.5 % OR LESS SULPHUR CONTENT BUNKER GRADE AS DEFINED IN THE C/P, HEREINAFTER CALLED "HFO") IN PLACE OF IMO 2020 COMPLIANT FUEL (0.5% OR LESS SULPHUR CONTENT, OF WHICH SPEC TO BE DEFINED BY IMO REGULATION, HEREINAFTER CALLED "IMO 2020 COMPLIANT FUEL"), THE CHARTERERS TO PROVIDE THE OWNERS EVIDENCE OF THE HFO PURCHASE PRICE. FOR CALCULATION OF THE BUNKER SAVING PROFIT THE IMO 2020 COMPLIANT FUEL PRICE TO BE THE PLATTS PRICE OF THE DAY CHARTERERS PURCHASED THE HFO AT THE PLACE WHERE THE HFO IS TO BE DELIVERED.

B) THE CHARTERERS TO REIMBURSE THE OWNERS 89% IN THE FIRM PERIOD AND THE OPTIONAL PERIODS FOR "THE DIFFERENCE IN PRICE BETWEEN OF HFO AND IMO 2020 COMPLIANT FUEL" AS DETAILED IN PARA 3.(A) X (MULTIPLY) "THE VOLUME OF BUNKERS DELIVERED" WITH THE NEXT HIRE PAYMENT AFTER THE RELEVANT BUNKER WERE DELIVERED TO THE VESSEL. THE CHARTERERS SHALL INFORM THE FORMULA AND THE RESULT OF THE AMOUNT OF PROFIT FOR THE OWNERS IN THE HIRE STATEMENT TOGETHER WITH A COPY OF THE ACTUAL VOUCHER OF PURCHASING THE SAID HFO AND IMO 2020 COMPLIANT FUEL, MARKET PRICE QUOTED BY RELIABLE SOURCES SUCH AS PLATTS OR OTHER RELEVANT MARKET REPORT IN THE RELEVANT PORT.

C) SHOULD THE VESSEL TRADE TO AN ECA ZONE REQUIRING MAXIMUM 0.1% SULPHUR CONTENT FUEL, THE OWNERS WARRANT THE VESSEL'S SCRUBBER IS ABLE TO MEET THIS REQUIREMENT CONSUMING HFO. THE CHARTERERS IN THIS INSTANCE TO CREDIT THE OWNERS FOR "THE DIFFERENCE IN PRICE BETWEEN 0.5% AND 0.1% SULPHUR CONTENT FUELS X (MULTIPLY) "BUNKERS ACTUALLY CONSUMED IN THE ECA ZONE". THE DIFFERENCE IN PRICE BETWEEN 0.5% AND 0.1% SULPHUR CONTENT FUELS TO BE CALCULATED ON BASIS OF THE PLATTS PRICE 0.5% FUEL APPLICABLE FOR THE DAY AND PLACE OF CHARTERERS LAST HFO PURCHASE PRIOR TO THE VESSEL ENTERED THE ECA ZONE AND THE 0.1% SULPHUR CONTENT FUEL PRICE OF CHARTERERS LAST PURCHASE PRIOR TO THE VESSEL ENTERED THE ECA ZONE.

THE CHARTERERS SHALL INFORM THE FORMULA AND THE RESULT OF THE AMOUNT OF PROFIT SHARE FOR THE OWNERS IN THE HIRE STATEMENT TOGETHER WITH A COPY OF THEIR LAST PURCHASE INVOICE OF 0.1% SULPHUR FUEL, THE 0.5% SULPHUR FUELS PRICE TO BE THE PLATTS PRICE VALID AT THE PLACE AND DATE WHEN AND WHERE CHARTERERS PURCHASED HFO LAST BEFORE ENTERING THE RELEVANT ECA ZONE.

IN CASE THE VESSEL PERFORMS A VOYAGE FOR ACCOUNT OF A T/C SUB-CHARTERER, AND IS SUPPLIED WITH BUNKERS BY THE SUB-CHARTERER, THEN THE PLATTS PRICES

SHALL APPLY FOR HFO, IMO 2020 COMPLIANT FUEL AND 0.1% SULPHUR CONTENT FUEL FOR THE REASON THAT NO PHYSICAL PURCHASE PRICES WOULD BE MADE AVAILABLE TO ADMINTERMARE BY THE SUB-CHARTERER.

IF THE VESSEL, AFTER SUCH T/C RELET, CONTINUES TO PERFORM CHARTERERS VOYAGE(S), THEN THE SUB-C/P PRICE FOR THOSE REDELIVERY BUNKERS FROM SUB-TIME CHARTERERS TO APPLY FOR CALCULATING OF ALL SCRUBBER PROFIT UNTIL CHARTERERS SUPPLIED BUNKERS TO THE VESSEL FOR THEIR ACCOUNT.

1.   [SCRUBBER TECHNICAL CLAUSE]

I.    OWNER WARRANTS THAT IT HAS EXERCISED DUE DILIGENCE AT THE TIME OF DELIVERY TO MAKE THE SCRUBBER OPERATIONAL, WHICH SHALL MEAN:

(I) OWNER HAS ALL NECESSARY PERMITS FOR THE SCRUBBER, AND
(II) IT SHALL BE CAPABLE OF REDUCING EMISSIONS TO COMPLY WITH MARPOL ANNEX VI, AND
(III) COMPLIANT WITH ALL APPLICABLE REGULATIONS AND REQUIREMENTS OF INTERNATIONAL, NATIONAL OR REGIONAL AUTHORITIES.

II.   IF THE CHARTERERS CANNOT BURN HIGH SULFUR BUNKER DUE TO THE SCRUBBER MALFUNCTION, THE CHARTERERS SHALL NOT ASK THE OWNERS TO COMPENSATE THE EXTRA BUNKER PURCHASE PRICE IN ANY CASE.

III.  ALL SCRUBBER CONSUMABLES AND DISPOSAL OF SCRUBBER WASTE/WATER SHALL BE FOR OWNER'S ACCOUNT.

2.    ALL OTHER TERMS AND CONDITIONS OF THE C/P SHALL REMAIN UNALTERED.

21) ALL SUBS LIFTED

END RECAP

Trust above in line with yr notes.

Many thanks again, my ops (cc) will take care as from now on.

Best regards,
Peer

_____
Frachtcontor Junge & Co. GmbH - Registered in Hamburg - HRB 78524 (AG Hamburg) - ISO 9001:2015 and 45001:2018 certified
Managing Directors: Jens Christian Nielsen, Thore Schiller

We are working exclusively "as Agents only", on the basis of German law and the General Business Conditions of the Association of German Shipbrokers (obtainable on request) which may be viewed at
https://nam02.safelinks.protection.outlook.com/?url=http%3A%2F%2Fwww.frachtcontor.com%2F&data=05%7C01%7CJuergen.werner%40adm.com%7Ce25024d45d85447aede908dbbb7ed870%7C2f55bf3242d444b3a8c2930ac8b182b2%7C0%7C0%7C638309926130132411%7CUnknown%7CTWFpbGZsb3d8eyJWIjoiMC4wLjAwMDAiLCJQIjoiV2luMzIiLCJBTiI6Ik1haWwiLCJXVCI6Mn0%3D%7C3000%7C%7C%7C&sdata=v2jgr6KhgSV9OGWYE7B8aVSnthD9BAR8EYGYZiBIYw4%3D&reserved=0.
Place of Jurisdiction: Hamburg

If our banking details change, we will notify these to you by letter or telephone, never by email

# Time Charter

**GOVERNMENT FORM**
*Approved by the New York Produce Exchange*
November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

**This Charter Party**, made and concluded in *Singapore* *28th* day of *April* ~~19~~ *2023*

Between *ADMIntermare, A Division of ADM International Sàrl, A One Business Center, La Pièce 3, CH-1180 Rolle • Switzerland; Registered in Switzerland N° Ch-550.1.052.13-9; Vat N° Che-113.903.886 TVA  as disponent*

Owners of the good ~~Steamship/~~Motorship *EASTERN HAWK* *- See Annex A for description* of

of                tons gross register, and                tons net register, having engines of                indicated horse power

and with hull, machinery and equipment in a thoroughly efficient state, and classed *NK*

at            of about            cubic feet bale capacity, and about *37,520*            tons ~~of 2240 lbs.~~

deadweight capacity (cargo and bunkers, including fresh water and stores *lubricating oil and Vessel's spare parts* ~~not exceeding one and one-half percent of ship's deadweight capacity,~~

~~allowing a minimum of fifty tons)~~ on a draft of            feet            inches on            Summer freeboard, inclusive of permanent bunkers,

which are of the capacity of about            tons of fuel, and capable of steaming, fully laden, under good weather

conditions about            knots on a consumption of about            tons ~~of best Welsh coal - best grade fuel oil - best grade Diesel oil,~~

now *on order*

and *Western Bulk Pte. Ltd.* as Charterers of ~~the City of~~ *#28-01, 16 Collyer Quay, Singapore-049318; P&I Club: North of England.*

**Witnesseth**, That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for

~~about~~ *Time Charter period of minimum 3 to about 5 months in Charterers' option via safe port(s) safe berth(s) safe anchorage(s) always afloat always within International Navigating Limits except NAABSA as per Charter Party*

within below mentioned ~~trading limits~~.

Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for

the fulfillment of this Charter Party. *Acceptance of delivery by the Charterers shall not constitute any waiver of the Owners' obligation hereunder.*

Vessel to be placed at the disposal of the Charterers, ~~at~~ *on dropping outward pilot Niihama at any time day or night Sundays and holidays included*

~~in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No. 6), as~~

~~the Charterers may direct. If such dock, wharf or place be not available time to count as provided for in clause No. 5.~~ Vessel*'s holds* on her delivery *at arrival first loading port for each hold (see also Clause 41)* to be

ready to receive cargo with clean-swept holds and *Vessel on delivery to be* tight, staunch, strong and in every way fitted for the service, having water ballast, ~~winches and~~

~~donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the winches at one and the same~~

~~time~~ (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful merchan-

dise, ~~including petroleum or its products, in proper containers,~~ excluding *(see clause 36)*

~~(vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at their risk,~~

~~all necessary fittings and other requirements to be for account of Charterers), in such lawful trades, between safe port and/or ports in British North~~

~~America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or~~

~~Mexico, and/or South America~~                                    ~~and/or Europe~~

~~and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between~~

~~October 31st and May 15th, Hudson Bay and all unsafe ports; also excluding, when out of season, White Sea, Black Sea and the Baltic,~~

*Worldwide trading, always within International Navigating Limits (I.N.L.), always via safe port(s), safe berth(s), safe anchorage(s), except*

*Albania, Nicaragua, North Korea, Israel, Cuba, Somalia, Eritrea, Rep. of Djibouti, D.R.C. (i.e. former Zaire), Syria, Iran, Iraq*

*Mozambique (but Maputo, Beira to be allowed), Liberia (but Monrovia and Buchanan to be allowed), Sierra Leone (Freetown to be allowed), Angola (Luanda to be allowed), Lebanon, Cambodia, Russian Pacific Ports during Asian Gypsy Moth season i.e. June to October (the Charterers shall fully indemnify the Owners from any liability, loss of time, damage or expenses arising from Asian gypsy moth by calling at Russian pacific ports), Tanzania, Turkish occupied Cyprus, Haiti, West of Matanzas of Orinoco River, north of San Lorenzo in the river Parana (except Tinibues and San Martin), any country/area banned and/or boycotted by UN or USA and war or warlike zones. When the Charterers instruct the Vessel to trade from the Japanese port(s) or any other port(s) which is (are) determined as high risk port(s) for contamination of Asian Gypsy Moth by the United States Department of Agriculture (USDA) and/or Canadian Food Inspection Agency (CFIA) and then to trade the port(s) in U.S.A. and/or Canada and/or New Zealand and/or Chile and/or Australia after calling such high risk port(s), the Charterers shall carry out the inspection to obtain Certificate of Freedom front Asian Gypsy Moth to be approved by USDA and CFIA for their time and expense. In case the Certificate of Freedom from Asian Gypsy Moth cannot be obtained, any loss of time and expenses caused is born by the Charterers. If the Owners proceed to AGM port risky for dry dock, the Owners have to arrange at their cost for an AGM Free Certificate prior departure from dry dock unless otherwise agreed. (See clause 37 and 67)*
*If the Vessel is to call at Ukrainian/Black Sea ports and Brazil/Argentine ports, the Charterers shall comply with following conditions*
*(1) Any time used to change ballast water is always for the Charterers' account*
*(2) The Charterers will endeavour to do upmost to assist Owners/Vessel to ensure cargo operations are completed smoothly. In the event of unreasonable claims lodged against the Vessel, the Charterers shall assist the Owners as fast as they are able in negotiating with local authorities.*
*- In addition to Charter Party, Russia, Ukraine and Venezuela calls excluded.*

as the Charterers or their Agents shall direct, on the following conditions:

1. That the Owners shall provide and pay for all provisions, wages *immigration* and consular shipping and discharging fees of the Crew *also all consular fees necessitated because of the Vessel's nationality of flag*; shall pay for the insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler water, *drinking water and lubricating oil* and maintain her class and keep the vessel in a thoroughly efficient state in hull, machinery and equipment *with all certificates (including tonnage and measurement certificates but except tonnage dues certificates for port charges) necessary to comply with requirements at ports of call and canals for and during the Charter Period, failing which the Owners are responsible for all time lost and expenses incurred thereby. The Owners or the Manager to be certified under Rules for compliance with International Safety ISM Management Code-Resolution A 741(18).* ~~for and during the service.~~

2. That *whilst the Vessel is on hire* the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, *canal tolls,* Pilotages, Agencies, Commissions, Consular Charges (except those pertaining to the Crew *and flag of the Vessel*), *fresh water for hold cleaning* and all other usual expenses except those before stated, but when the vessel puts into a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of illness of the crew to be for Owners account. Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this charter to be for Charterers account. ~~All other fumigations to be for Charterers account after vessel has been on charter for a continuous period of six months or more.~~ *Owners to provide and keep on board a valid sanitation certificate throughout the Charter Party period.*

Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, but Owners to allow them the use of any dunnage and shifting boards already aboard vessel. ~~Charterers to have the privilege of using shifting boards for dunnage, they making good any damage thereto.~~

~~3. That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on board the vessel at the current prices in the respective ports, the vessel to be delivered with not less than_____tons and not more than_____tons and to be re-delivered with not less than_____tons and not more than_____tons.~~ *(see clause No. 40)*

4. That the Charterers shall pay for the use and hire of the said Vessel at the rate of *USD 13,250 daily including overtime hire payable every 15 days in advance.*
*First hire plus bunker on delivery to be paid within 3 banking days after Vessel's delivery. Charterers' option to deduct estimated redelivery bunkers from last sufficient hire payment(s). In case Charterers deduct estimated partial or full redelivery bunkers, then hire to be paid upto estimated date of redelivery*
~~United States Currency per ton on vessel's total deadweight carrying capacity, including bunkers and stores, on_____summer freeboard, per Calendar Month,~~ commencing on and from the ~~day~~ *time* of her delivery, as aforesaid, and at and after the same rate for any part of a ~~month~~ *day*; hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary wear and tear excepted, to the Owners (unless lost) ~~at~~ *on dropping last outward sea pilot or passing in Charterers' option : Singapore/Japan, including Thailand, Malaysia, Taiwan, Brunai range  at any time day or night Sundays and holidays included* unless otherwise mutually agreed. Charterers are to give Owners not less than *30/20/15 days' notice of Vessels expected date of redelivery and probable port, and 10/7/5/3/1 day(s) definite notice with port of redelivery.* ~~days notice of vessels expected date of re-delivery, and probable port.~~

5. Payment of said hire to be made in ~~New York~~ *(see Annex A)* in cash in United States Currency, ~~semi-monthly~~ *every 15 days* in advance, and for the last ~~half month~~ *15 days* or part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance *expected* ~~day by day~~, as it becomes due, ~~if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the hire, or bank guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Charterers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. Time to count from 7 a.m. on the working day following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they to have the privilege of using vessel at once, such time used to count as hire.~~ *(see clause 55A and 55B)*

Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents, subject to 2 1/2% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application of such advances. *(see clause 55B)*

6. That the cargo or cargoes be laden and/or discharged in any dock or at any wharf or place/*anchorage* that Charterers or their Agents may direct, provided the vessel can safely lie always afloat at any time of tide, except *in Argentina, Uruguay, River Plate, but not north of San Lorenzo (Tintbues and San Martin are allowed), Buenaventure in Colombia, Santos, Paranagua, Rio Grande, Sao Francisco do Sul in Brazil* at such places where it is customary for similar size vessels to safely. *The Charterers shall indemnify the Owners for any loss, damage, costs, expenses or loss of time, including any underwater inspection required by class, caused as a consequence of the Vessel lying aground at the Charterers request.* lie aground. *NAABSA to be applied for grain loading port only.*

7. That the whole reach of the Vessel's Hold, ~~Decks,~~ and usual places of loading (not more than she can reasonably stow and carry), also accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew, tackle, apparel, furniture, provisions, stores and fuel. *No passengers.* ~~Charterers have the privilege of passengers as far as accommodations allow, Charterers paying Owners_____per day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expenses are incurred in the consequences of the carriage of passengers, Charterers are to bear such risk and expense.~~

8. That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards *Vessel's* employment and agency; and Charterers are to load, stow, and trim *secure and discharge* the cargo at their expense under the supervision of the Captain, who is to sign

Bills of Lading for

cargo as presented, in conformity with Mate's or Tally Clerk's receipts.

9.    That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.

10.    That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel and see that voyages are prosecuted with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the rate of $1*0*.00 per day. Owners to victual Pilots and Customs Officers, *and provide accommodation, if available,* and also, when authorized by Charterers or their Agents, to victual Tally

Clerks, Stevedore's Foreman, etc., Charterers paying *US$5.00* ~~at the current rate~~ per meal, for all such victualling. *A lumpsum of US$1,500.- per month or pro rata for communication charge and including entertainment.*

11.    ~~That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Charterers, their Agents or Supercargo, when required, with a true copy of daily Logs, showing the course of the vessel and distance run and the consumption of fuel.~~ *(see clause 34)*

12.    That the Captain shall use diligence in *the care and* ~~caring for~~ the ventilation of the cargo.

13.    ~~That the Charterers shall have the option of continuing this charter for a further period of~~ ..................................................................................................................................................................................................................................................................... ~~on giving written notice thereof to the Owners or their Agents~~ ................................ ~~days previous to the expiration of the first-named term, or any declared option.~~

14.    That if required by Charterers, time not to commence before *00:01 hours local time of 01st May 2023*                and should vessel not have *been delviered* ~~given written notice of readiness~~ on or before *23:59 hours local time of 04th May 2023*    ~~but not later than 4 p.m.~~ Charterers or their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness.

*Owners to give daily notice of delivery upon clean fixing.*

15.    That in the event of the loss of time from *default and/or* deficiency *and/or death* of men or stores, fire, breakdown or damages to hull, machinery or equipment, grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost; and if upon the voyage the speed be reduced by defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence thereof, and all extra expenses shall be deducted from the hire.

16.    That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas, Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted. The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the purpose of saving life and property, *time and cost for such deviation to be equally shared between the Owners and the Charterers*.

17.    ~~That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at New York, one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial men.~~ *(see clause 70)*

18.    That the Owners shall have a lien upon all cargoes, ~~and~~ all sub-freights*, adn sub-hire* for any amounts due under this Charter, including General Aver-age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which might have priority over the title and interest of the owners in the vessel.

19.    That all derelicts and salvage shall be for *the* Owners' and *the* Charterers' equal benefit after deducting *the* Owners' and *the* Charterers' expenses and Crew's proportion. General Average shall be adjusted, stated and settled, according to Rules 1 to 15, inclusive, 17 to 22, inclusive, and Rule F of York-Antwerp Rules *1994 as uptodated in London* ~~1924, at such port or place in the United States as may be selected by the carrier, and as to matters not provided for by these Rules, according to the laws and usages at the port of New York. In such adjustment disbursements in foreign currencies shall be exchanged into United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods.~~ Such cash deposit as the carrier or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. ~~Such deposit shall, at the option of the carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in United States money.~~

~~In the event of accident, danger, damage, or disaster, before or after commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices, losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or~~

~~ships belonged to strangers.~~ *Hire is not to be contributed to General Average.*

Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder.

20.    Fuel used by the vessel while off hire, *to be deducted from hire* ~~also for cooking, condensing water, or for grates and stoves to be agreed to as to quantity,~~ and the

cost of replacing same, to be allowed by Owners.

21.    ~~That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.~~

*(see Clause 73)*

22.    *The* Owners shall maintain the gear of the ship as fitted, providing gear ~~(for all derricks)~~ *for all cranes* capable of handling lifts up to *their maximum capacity in accordance with Clause 29* ~~three tons~~, also

providing ropes, *and maintaining runners,* falls, slings and blocks *as on board.* ~~If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide necessary gear for~~

~~same, otherwise equipment and gear for heavier lifts shall be for Charterers' account. Owners also to provide on the vessel lanterns and oil for~~ ~~night work, and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at Charterers' expense. The~~ ~~Charterers to have the use of any gear on board the vessel.~~ *The Owners also to provide and maintain in efficient working order adequate electric light for night work on board.*

23.    Vessel to work night and day, if required by Charterers, ~~and all winches~~ to be at Charterers' disposal during loading and discharging; ~~steamer to provide one winchman per hatch to work winches day and night, as required, Charterers agreeing to pay officers, engineers, winchmen, deck hands and donkeymen for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the rules of the port, or labor unions, prevent crew from driving winches, shore Winchmen to be paid by Charterers. In the event of a disabled winch or winches, or insufficient power to operate winches, Owners to pay for shore engine, or engines, in lieu thereof, if required, and pay any loss of time occasioned thereby.~~

*In the event of a disabled crane or crane(s), or insufficient power (solely by the Vessel) to operate cranes and grabs, charter hire to be reduced pro-rata for the period of such inefficiency in relation of the number of hatches workable, and the Owners to pay any extra costs including standby time, but maximum one shift for shore labour. The Charterers have the option to hire shore appliances to continue for which Owners to pay but Vessel in this case remaining on-hire. If the Vessel is detained as a result of disabled crane(s), which detention would not have occurred had the crane(s) been available and efficient at all times, Vessel to be off-hired. In the event of a breakdown of crane(s) due to proven negligence or rough handling by stevedores, the Vessel to remain on hire during any time spent for their repair and until cargo work is resumed. Any such repair shall be settled in accordance with Clause 47.*

24.    ~~It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels; etc.," in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to the following clauses, both of which are to be included in all bills of lading issued hereunder:~~

~~U. S. A. Clause Paramount~~

~~This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading be repugnant to said Act to any extent, such term shall be void to that extent, but no further.~~

~~Both to Blame Collision Clause~~

~~If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or carrier.~~

25.    The vessel shall not be required to enter any ice-bound port, or any port where lights or light-ships have been or are about to be withdrawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the port or to get out after having completed loading or discharging. *The Vessel never to force nor to push ice, nor to follow ice breakers.*

26.    Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the navigation of the vessel, *acts of pilots and tugboats,* insurance, crew, and all other matters, same as when trading for their own account.

27.    A commission of *1.25* ~~2 1/2~~ per cent is payable by the Vessel and Owners to *Maersk Broker Bulk Charterting A/S to be collected from Owners*

on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.

28.    An address commission of *3.75* ~~2 1/2~~ per cent payable *Charterers* to on the hire earned and paid under this Charter.

*Clause Nos. 29 to 106 both inclusive as attached, Annex "A" , Annex "B" and Annex "C" as attached, the Both to Blame Collision Clause, The New Jason Clause, Clause Paramount, P and I Bunkering Clause are to be considered as part of this Charter Party.*

MAERSK BROKER
SHIPBROKERS SINCE 1914

*THE OWNERS:*                                          *THE CHARTERERS:*

*ADM INTERMARE,*                                       *WESTERN BULK PTE LTD*

*A DIVISION OF ADM INTERNATIONAL SARL*


_____                    _____

*Signatory:*                                           *Signatory:*
*Position:*                                            *Position:*


This Charter Party is a computer generated copy of the NYPE46 form printed by authority of the Association of Ship Brokers & Agents (USA) Inc. (ASBA), using software which is the copyright of Maritech Limited. Any insertion or deletion to the form must be clearly visible. In the event that any modification is made to the pre-printed text of this document, and is not clearly visible, the provisions of the original ASBA-approved document shall apply. ASBA and Maritech Limited (collectively, "we") assume no responsibility for any loss or damage caused as a result of discrepancies between the original ASBA-approved document and this document.

We provide you with access to the form on an "as is" and "as available" basis. We do not make any warranty or commitment that the form will operate free of errors, viruses or without interruption or meet your requirements. All warranties, conditions and other terms implied by statute or common law are excluded to the maximum extent permitted by applicable law. You assume sole risk and responsibility for the use of the form and for the results obtained and for conclusions drawn from using it. We will have no liability or responsibility for any loss, damage or cost (a) caused as a result of discrepancies between the original ASBA-approved document and this document, (b) caused by errors or omissions in any data, information, instructions or scripts, including any data you have entered in connection with the form, (c) in relation to the loss or destruction of or any damage to any such data, (d) caused by any actions we may take at your direction or (e) resulting from any decision you take in reliance on the form, including any legal, compliance and/or risk management decision. You acknowledge that by providing the form for use we are not providing legal, other professional or other advice. The foregoing does not affect our liability in respect of death or personal injury caused by negligence or that otherwise cannot be limited under law.

By accepting access to ASBA Charter Forms you agree to defend, indemnify and hold harmless ASBA, its affiliates, and their respective officers, directors, employees, agents, shareholders, partners, members, successors and assigns from and against any and all losses, liabilities, expenses (including reasonable attorneys' fees and costs), claims, suits, actions and damages arising from, or in connection with, (i) any third party claims or actions related to your use of the ASBA Charter Forms or ASBA trademarks, (ii) your violation of any applicable law or regulation in connection with the use of the ASBA Charter Forms or ASBA trademarks, other than that which you can demonstrate was pursuant to ASBA's instructions, (iii) your unauthorized use of any of the ASBA Charter Forms or ASBA trademarks (iv) gross negligence or wilful misconduct by you or any of your employees, contractors or agents, except to the extent directly or indirectly caused by any act or omission of ASBA.

### ADDITIONAL CLAUSES TO EASTERN HAWK
### CHARTER PARTY DATED 28TH APRIL 2023

#### 29. SPECIFICATIONS

Please see Annex A.

#### 30. GRAIN LOADING

The Vessel is suitable for carrying cargoes of heavy grain in bulk in all holds without requiring any securing arrangements. For the carriage of grain in bulk, the Vessel to have on board at any time of this Time Charter Period valid documents and certificates issued by a recognized classification society and certificates issued by Cargo Bureau on the basis of SOLAS. 1974.

Furthermore, the Vessel has on board approved table of heeling moments for "filled holds-untrimmed ends" in accordance with IMCO BC XIX/INF.4 or latest up to dated amendment.

#### 31. ALTERNATE HOLDS LOADING

Vessel is strengthened for heavy cargoes and holds 2 and 4 may be left empty, leaving Vessel able to load a full DWT cargo in the remaining holds in accordance with loading manual approved Class.

The Charterers have the option to install artificial separations for the purpose of separating different grades of cargo. All associated time and costs of installation and removal of fittings to be for the Charterers' account. Work to be performed to Master's satisfaction and fittings to be removed prior to Vessel's redelivery. The Charterers shall remain responsible for any claims arising from cross-contamination between the grades thereby separated. In the event welding is necessary in the holds to install separations, the Charterers shall provide the Owners with welding plans prior to loading the cargo for the Owners' approval which not to be unreasonably withheld.

#### 32. I.T.F.

It is hereby mutually agreed between the Owners/Charterers that the Owners of the Vessel guarantee that the minimum terms and conditions of employment of the crew are now, or will be prior to representation of the Vessel for delivery, and will remain for the period of this Charter Party, covered by an I.T.F. Agreement or a Bona Fide Trade Union Agreement acceptable to the I.T. F.

#### 33. WATER BALLAST

The Charterers have the right to instruct the Master to utilize the Vessel's maximum water ballast capacity, including fioodable hold(s) in order to bring down the Vessel's height to get into position under loading and/or discharging appliances however in conforming with freeboard and safety regulations.

#### 34. INSTRUCTIONSNOYAGE RECORD

The Charterers shall furnish the Master from time to time with all requisite instructions and sailing direction, in writing or by telegram and the Master shall keep a full and correct deck and engine log of the voyage or voyages, showing, inter-alia, the course of the Vessel and distance run and consumption of fuel oil which is to be patent to Charterers or their agents a true copy of which is to be sent to the Charterers (directly or via agents) from each port of call on the voyage and immediately after completion of the voyage, together with any other information which the Master deems necessary. Deck and engine log to be written in English.

#### 35. OCEAN ROUTES

The Vessel shall be capable at all times during the currency of this Charter of steaming as per description.

WORKING COPY

For the purpose of this Charter "good weather conditions" are to be defined as weather conditions with wind not exceeding Beaufort Force 4 and Sea Douglas 3.

The Charterers may in their option and at their cost engage an independent weather routing company to monitor Vessel's course, position, speed, etc. in order to maximize Vessel's performance, Master is to follow the independent weather routing company's suggestions concerning navigation but Master, at his reasonable discretion, may not follow suggested route in which case he has to detail in log book the reasons for departing from them.

Any deviation to be advised as soon as possible both to the independent weather routing company and to the Charterers' stating reason. In the event of consistent discrepancy between deck log and the weather routing company, the Owners and the Charterers shall discuss in good faith, but if they cannot reach an agreement, the independent calculations carried out by the independent weather routing company to be accepted as binding by both parties. However, in the event of inconsistent discrepancy, calculations by deck log to be accepted by both parties.

## 36. CARGO EXCLUSIONS

The Vessel shall be employed in carrying lawful cargoes excluding any goods of dangerous, injurious flammable or corrosive nature classified under the regulations and requirements of IMO, SOLAS and Vessel's class. Without prejudice to the generality of the foregoing, the following cargoes are specifically excluded from the carriage by the Vessel.

Livestock, arms, ammunition, explosives, nuclear and radioactive material and its waste, petroleum or its products (see below for petcoke), tar, pitch in bulk, borax in bulk, bitumen, quebracho, sodium sulphate, calcium hypochlorite, hydrochloride, bone meal, charcoal, turpentine, ferro-silicon, oil cake (but all oil extracted pellets which is not dangerous grade in accordance with IMSBC code, to be allowed and to be carried), resin, cotton, nitrate, lime, Chilean nitrate, caustic soda, copra, pond coal, pebbles, Indian coal, sponge iron, asphalt, sunflowerseed expellers, ammonium nitrate (except ammonium nitrate based fertilizers : NPK cargo belongs to group C), naphtha and its products, direct reduced iron, direct reduced iron ore pellets, hot briquetted iron, asbestos, hides, scraps of any kind, motor blocks and turnings, creosoted goods, calcium carbide, acids, brown coal, fish meal, motor spirits, industrial waste, seed cake (belonging to group B except palm kernel expeller (PKE) IMO class 4.2 UN # 1386 (a+b), on-deck cargo (but Owners will allow the Charterers to load cargo on deck but always SUBJECT CLASS approval and such approval or refusal to be done within 1 Japanese business day after received the sufficient details of cargo to be loaded. Any directly related costs associated with the carriage of cargo on deck, such as extra lashing materials, to be for Charterers' account) and any other cargoes (except coal and petcoke) categorized as Group B under IMSBC Code.

Log Clause:
South East Asian log not to be allowed to load, but African logs to be mutually discussed and concluded by the Charterers and the Owners when the Charterers have a chance to work out these cargoes. In any case, Sinker and Mahogany shall be excluded. The Charterers cooperate to load maximum four (4) cargoes per year in total.

If permitted by local regulations Vessel's crew shall perform extra work, if so requested by the Charterers, such as setting stanchion, lashing, relishing or unlashing of cargo or collecting, restowing lashing materials including catwalk, cargo mark off, painting, etc. All consumable materials including catwalk materials, separation materials, paint, painting accessories, etc., shall be provided by the Charterers, the Charterers shall provide all equipment including measuring equipment required for all fumigation including In-transit along with instructions. The crew bonus for above described extra work is not included in hire and overtime. The Charterers shall pay to Master extra allowance for such work concerning log trade which amount to be applied as per Clause 39 (7).

The Owners confirm Vessel is fully fitted Logger equipped to load/stow/carry full and complete cargo of logs below/on deck. Logs cargoes from Australia, New Zealand always allowed. In case loading logs ex USA/Canada, the Owners/Charterers to discuss amicably on a case by case basis, and if required by the Owners, the Charterers have the option to employ and pay for port captain to assist the Master/crew in overseeing the loading. If logs carried ex USA/Canada require additional lashing materials beyond what is required for Australia origin logs, the Charterers to arrange the additional lashing materials.

See below for petcoke, salt, sulphur, scrap and cement in bulk or cement clinker:
The Charterers are allowed to carry maximum 2 dirties, include scrap/petcoke/salt/clinker/sulfur allowed for this duration - 1 of each type, no consecutive, dirty as last allowed against an in lieu of hold cleaning at USD 25,000 lumpsum. Concentrates are not considered dirty in the terms of Charter Party.

In any case Charterers to tender timely redelivery notice for dirty as last. i..e. minimum 25 days.

Petecoke Clause

Two (2) cargoes of Petroleum Coke per year, but shall not be consecutive voyages and shall not be last voyage before redelivery. If Petroleum Coke is loaded, the Charterers are to thoroughly clean the Vessel's hold to the Master's satisfaction at the Charterers' time and expense. The Charterers may request the Vessel's crew to perform hold cleaning paying lumpsum bonus per hold (Additional crew bonus USD300/hold for Petcoke/Cement/Cement Clinker/Salt/Sulphur) in addition to regular intermediate hold cleaning bonus subject to port authority, local regulations and weather permitting.

Cement/Cement Clinker Clause

Two (2) cargoes of Cement or Cement Clinker per year, but shall not be consecutive voyages and shall not be last voyage before redelivery. If Cement or Cement Clinker is loaded, the Charterers thoroughly clean the Vessel's hold to the Master's satisfaction at the Charterers' time and expense. The Charterers may request the Vessel's Crew to perform hold cleaning paying lumpsum bonus per hold. (Additional crew bonus USD300/hold for Petcoke/Cement/Cement Clinker/Salt/Sulphur) in addition to regular intermediate hold cleaning bonus subject to port authority, local regulations and weather permit.

Salt Clause:

Salt be loaded, stowed, carried and discharged strictly in accordance with applicable national/ international regulations and/or IMO regulations at the Charterers' risk and expense.

The Charterers are permitted to load maximum two (2) cargos per year which not to be consecutive and not to be the last cargo prior to redelivery and the following procedure to be arranged. Where customary according to local regulations, holds to be thoroughly washed by Vessel's crew with fresh water before loading and after discharging at the Charterers' time, risk and expenses. The Charterers shall pay a lumpsum bonus per hold (Additional crew bonus USD300/hold for Petcoke/Cement/Cement Clinker/Salt/ Sulphur) cleaning allowance in addition to normal hold cleaning allowance.

Sulphur Clause

The Charterers have the option to load maximum two (2) cargoes of "lump and coarse grained Sulphur" formed to a specific shape (e. g. prills, granules, pellets, pastilles or flakes) per year, but shall not be consecutive voyages nor to be last voyage before redelivery and to be loaded, stowed, carried and discharged strictly in accordance with regulations and requirements of IMO, SOLAS and the Vessel's class at the Charterers' risk and expense.

However, Sulphur as above shall not be allowed to load; unless a DG certification from shipper proving that the cargo does not emit any dust and is not categorized as dangerous goods.

Painting, lime-coat or chemical coating clause for loading salt/sulphur:

The Charterers shall paint, lime-coat or chemical coating like Hold Block 10, PRELOAD 300, SLIP COAT in the Charterers' option the Vessel's holds prior to loading salt or Sulphur and remove after completion of discharging up to Master's satisfaction at the Charterers' time, risk and expense. If required by the Charterers, subject to port authority, local regulations and weather permitting, Crew to carry out painting (or lime-coating or Hold Block 10 if compulsory) and removal at the Charterers' time, risk and expense, for which the Charterers shall pay "USD 1,000" per hold used for painting (coating) and removal respectively in addition to the normal hold cleaning allowance."

The Charterers assure to take following procedures:

The Charterers to provide the products prior loading together with all equipment necessary for the applications.

The Charterers to provide Vessel's crew personal instruction from suitable qualified person during the application process.

Upon completion of discharge, a further product to be supplied together with all equipment necessary for the removal and again crew to be provided suitable instruction.

The cost of the product, the equipment to be borne by the Charterers and the instruction to be made by the Charterers.

Scrap clause:

The Charterers have the liberty of carrying max two (2) cargoes of Scrap including HMS1+2, bushlings, bonus scrap and excluding motor spirits, turning, motor blocks, each year if exercised on following conditions:

a) The first layer of scrap to be lowered as close as possible to Vessel's tank top in order to a proper cushion to Master's satisfaction.

b) Scrap not to be the last cargo prior to redelivery.

MAERSK BROKER
SHIPBROKERS SINCE 1914

c) The Charterers to arrange, at their time and expense, holds survey before loading and after to ascertain damages to the holds.

d) Should electro-magnets be used during loading or discharging, then the risk/time/ expense of re-calibrating Vessel's compass (if necessary) to be for the Charterers' account.

The Vessel can load 2 tiers 25 tons coils with condition - 2.2m x 2.0m0 with 4 lines of wooden dunnages per 1 coil.

## 37. BREAKING I.N.L.

The Charterers may break INL subject always to a prior consent of the Owners which not to be unreasonably withheld.

The Charterers to pay any additional premium for breaking INL as per the Owners' payment vouchers.

## 38. BIMCO DOUBLE BANKING CLAUSE

a) The Charterers shall have the right, where and when it is customary and safe for Vessels of similar size and type to do so, to order the Vessel to go, lie or remain alongside another Vessel or Vessels of any size or description whatsoever or to order such Vessels to come and remain alongside at such safe dock, wharf, anchorage or other place for transshipment, loading or discharging of cargo and/or bunkering.

b) The Charterers shall pay for and provide such assistance and equipment as may be required to enable any of the operations mentioned in this clause safely to be completed and shall give the Owners such advance notice as they reasonably can of the details of any such operations.

c) Without prejudice to the generality of the Charterers' rights under (a) and (b), it is expressly agreed that the Master shall have the right to refuse to allow the Vessel to perform as provided in (a) and (b) if in his reasonable opinion it is not safe so to do.

d) The Owners shall be entitled to insure any deductible under the Vessel's hull policy and the Charterers shall reimburse the Owners any additional premium(s) required by the Vessel's Underwriters and/or the cost of insuring any deductible under the Vessel's hull policy.

e) The Charterers shall further indemnify the Owners for any costs, damage and liabilities resulting from such operation. The Vessel shall remain on hire for any time lost including periods for repairs as a result of such operation.

## 39. CREW SERVICE

Subject to local regulations permit, the following service in respect of loading and discharging, operation from Officers and crew are included in hire.

1. Raising, lowering and rigging cranes and/or gangways in preparation for loading and discharging, if port regulation permits.

2. Opening and closing of hatches in connection with loading and discharging if local regulations allow, otherwise to be for the Charterers' account.

3. Closing and opening of hatches in the event of weather which may adversely affect condition of cargo carried on board during loading and discharging, if port regulation permits.

4. Maintaining sufficient electric power and all cranes whilst loading and discharging including regular maintenance and shifting between berths.

5. Docking and undocking in connection with loading/discharging cargo or bunker. Necessary assistance in the Vessel's bunkering operation.

6. Officers and crew to shape up Vessel's hatches and cranes as much as possible prior to arrival at loading and/or discharging places so as to immediately commence loading and/or discharging operations subject to seaworthiness, weather condition and safety of crew and always Master's sole discretion.

7. The Charterers pay to Master USD 2,500 for crew's extra works for concerning log trade as per 2nd paragraph in Clause 36 "Log Clause"

## 40. BUNKERS ON DELIVERY/REDELIVERY

Bunker on delivery about 900 metric tons HFO (maximum 3,5pct sulphur) about 80 metric tons LSMGO/ bunker on redelivery same quantities and qualities as bunker on delivery.

WORKING COPY

USD 485 per mt for HFO, USD 740 per mt for LSMGO.

(Vessel has scrubber - see Clause 104)

The Charterers shall take over and pay for value of bunkers on board on delivery.

The Charterers are allowed to replenish bunkers before delivery at the Charterers' expenses, and the Owners are allowed to replenish bunkers before redelivery at the Owners' expenses subject to the Charterers' prior approval which not to be unreasonably withheld. Wherever the word "fuel" appears in this Time Charter Party, same is understood to mean "bunkers". Fuel Oil to conform with IFO 380 CST ISO 8217:2005-or 2010(e) RMG 380,

Diesel Oil to confirm with ISO 8217:2005 or 2010 DMA.
Where ISO 2010 specs are not available the Charterers are allowed to supply ISO 2005 specs.
The Charterers have the option to supply RME 180 CST or RMF 180 in case RME 180 is not physically available in ports where no IFO 380CST is available.
In Brazil the Owners to accept PETROBRAS specifications which shall be complied with the ISO 8217 2005 and have a low metal content respectively MDO (DMA or DMB) in main engine/auxiliaries.

## 41. HOLD CONDITION FOR FIRST LOADING

Vessel holds on delivery at arrival first loading port for each hold, shall be washed down with fresh water, dried, free of rust scale and previous cargo residue in addition to being suitable for harmless fertilizer as first cargo to the satisfaction of Charterers and shippers surveyor. If the holds are found to be unsuitable, all time from her failure until the hold(s) are accepted will be for Owners account and Vessel stands off-hire, Owners to rectify the problem by fastest means possible. Any/all additional expenses/delays whatsoever faced by Charterers due to Vessel hold failure as compared to if holds were passed on arrival, to be on Owners' account. Costs for stevedores standby limited to maximum one shift.

## 42. HOLDS CLEANING BY CREW

The Vessel's crew shall clean cargo holds if required by the Charterers against the Charterers' payment of crew bonus to be agreed, provided permitted by shore regulations of the port, weather permitting and enough time is allowed. The Charterers shall supply necessary chemicals, materials, hatch sealing tapes, and equipment for hold/hatch maintenance required by Master and/or the Owners for the Charterers' account.
Crew to perform holds cleaning at best of their capability, however the Owners are not responsible for the Vessel's not passing cargo hold inspection in all respects and any delay due to the failure to pass the cargo hold inspection shall not be considered as off-hire.
In case hold cleaning is not permitted by shore regulations of the port and shore labour is necessary to be arranged, the same to be for the Charterers' account.
Vessel to have on board suitable equipment to perform such cleaning including but not limited to: extendible ladders, hoisting equipment, water pressure lines in order to facilitate crew and expedite operations.
The Charterers to pay the Owners a lumpsum compensation for such intermediate cleaning and per hold actually cleaned:
- USD 600 per hold actually cleaned for cargoes which require a grain standard
- USD 400 per hold actually cleaned for all other cargoes

## 43. HOLDS CLEANING ON REDELIVERY

The Vessel shall be redelivered by the Charterers to the Owners with clean swept holds washed down and dried up free from residues. However the Charterers shall have the option to redeliver the Vessel with holds as are discharged and left by stevedores, in consideration of which the Charterers shall pay a lumpsum compensation of USD 5,000. - to the Owners.

## 44. CARGO HOLD PAINTING

Painting of Vessel's cargo holds during the currency of this Charter to be done only after consultation and with the Charterers'

WORKING COPY

express permission, in case required by the Charterers, time and expenses (excepting such painting during drydocking) to be for the Charterers' account.

The Owners may paint holds in order to keep Vessel's holds clean/rust free at the best of their capacity as usual maintenance without the Charterers' permission.

## 45. SUPERFICIAL INSPECTION

The Charterers shall have the option of holding at any time of this Charter Party a superficial inspection at their time/expense/risk without interference with Vessel's normal operation.

The Owners or Master to give every facility and assistance to carry out this inspection.

## 46. HATCH OPERATION

All opening and closing of hatches to be done by Vessel's crew, if requested by the Charterers, allowed by shore regulations and weather conditions.

## 47. STEVEDORE DAMAGES

Vessel is guaranteed suitable for grab discharge, Vessel has clear and unobstructed holds with no deeptanks or other provisions except Australian hold ladders. Master to notify in writing stevedores and to all parties involved of any damage during loading and/or discharging by latest twenty four (24) hours after the damage is discovered, except for a case of hidden damage, which to be notified as soon as practicable after discovery prior to redelivery.

In any case, the Master to pay due diligence at loading port to discover and to declare the damage to the stevedores and to all parties involved. Master to endeavor to obtain written admission of liability from party involved but the Charterers are ultimately responsible for the settlement. The Charterers have the privilege of using bulldozers in Vessel's holds and any damages, except normal wear and tear, caused by bulldozers to be considered as stevedores damage.

Damages affecting Class or seaworthiness or cargo worthiness to be repaired immediately at the Charterers' time and expenses and damages not affecting the same may be postponed to dry-dock will be evaluated by reputable shipyard at the time of occurrence and the Charterers to have the option either to repair during such dry-dock or to reimburse as evaluated at the time of occurrence which is settled as soon as possible.

## 48. DUTIES

Any taxes levied by any government other than that of the Owners' domicile or the Vessel's flag in respect of the earnings of the Vessel under Time Charter shall be for the Charterers' account.

## 49. SMUGGLING

The Charterers to be responsible for any fines whatsoever imposed in the event of smuggling by the Charterers' employees, servants/agent or cargo interests but the Owners to be responsible for any such acts of their own Officers and/or crew. The Charterers to remain responsible for detention of the Vessel due to smuggling committed by the Charterers' employees, servants/agent or cargo interests only.

## 50. BOYCOTT

Should the Vessel be boycotted, picketed, blacklisted or similar incident may occur at any port or place by shore and/or port labour and/or tugboat and/or pilot, or by government labours and/or any authority, by reason of Vessel's flag/registry/manning or the Ownership or terms and conditions on which members of the Officers/crew are employed or by reason of trading of this Vessel, or by reason of Vessel's construction and/or her fitting and/or her other equipments, all consequences and any extra expenses incurred therefrom to be for the Owners' account and the Charterers are entitled to place the Vessel off hire for any time lost by such reason.

### 51. VACCINATION

The Owners to arrange at their expense that the Master, Officers and crew of the Vessel hold valid vaccination certificates upon delivery of the Vessel and throughout the Time Charter Period.

### 52. DETENTION

Should the Vessel be seized or detained by any government or legitimate authority or in consequence of any legal action against the Owners and/or the Vessel during the currency of this Charter, the Charterers' liability shall cease from the time of such seizure or detention.

All time lost shall be treated as off-hire until the time of her release and return to the same or equivalent position and any extra expenses, including the cost of bunkers consumed during such period, to be for the Owners' account unless such seizure or detention is occasioned by any personal act or omission or default of the Charterers or their agents, or by reason of cargo carried.

The Charterers to have the option to cancel balance of charter period after the Vessel has been off-hire under this clause for not less than fifty (50) consecutive days.

### 53. REQUISITION

Should the Vessel be requisitioned by the government of the Vessel's flag during the period of this Charter, the Vessel shall be deemed to be off-hire during the period of such requisition, and any hire paid by the said government in respect of such period shall be retained by the Owners.

The period during which the Vessel is under requisition to the said government shall count as part of the period provided for in this Charter. If the period of requisition exceeds three (3) months, either party shall have the option of cancelling this Charter and no consequential claim be made by either party.

### 54. DRUG AND ALCOHOL

The Owners to be signatory of the initiative sea carrier agreement and maintain a policy on drug and alcohol abuse applicable to the Vessel which meets or exceeds the standard in the Oil Companies International Marine Forum Guidelines for the control of drugs and alcohol on board ships.

The Owners to be responsible for all cost arising from detention, seizure and forfeiture of the Vessel in the event of any contraventure of U.S. Antidrug Abuse Act of 1986 or subsequent amendments and Vessel to be off hire for any period during such detention, seizure or forfeiture unless caused by the Charterers and/ or the Charterers' servant or Shippers in which case the Charterers to be fully responsible for all consequences arising therefrom.

### 55. DELAY OF HIRE PAYMENT

Failing the punctual and regular payment of the hire, or on any fundamental breach of this Charter Party, the Owners shall be at liberty to withdraw the Vessel from the service of the Charterers without prejudice to any claims they (the Owners) may otherwise have on the Charterers.

At any time after the expiry of the grace period provided in clause 55. A hereunder and while the hire is outstanding, the Owners shall without prejudice to the liberty to withdraw be entitled to withhold the performance of any and all of their obligations hereunder, after having given to the Charterers formal notice of three (3) days notice, and shall have no responsibility whatsoever for any consequence thereof, in respect of which the Charterers hereby indemnify the Owners, and hire shall continue to accrue and any extra expenses resulting from such withholding shall be for the Charterers' account.

55. A - GRACE PERIOD

Where there is a failure to make punctual and regular payment of hire due to oversight, negligence, errors or omissions of the part of the Charterers or their bankers, the Charterers shall be given by the Owners three (3) banking days (in which bank are open both the Charterers'/Manager's place of business and Tokyo, excluding the day in which notice is given) written notice to rectify the failure, and when so rectified the payment shall stand as regular and punctual.

55. B - OWNERS' DISBURSEMENT

The Charterers may deduct from any hire payment(s) any amount disbursed for the Owners' account with the Owners prior consent and supported by vouchers or necessary proof and from final payment(s) the estimated cost of bunker remaining on board, together with the estimated amount of disbursement for the Owners' account to which vouchers have not yet received.

## 56. DEVIATION AND PUTTING BACK

Should the Vessel put back or put into any ports other than those instructed by the Charterers for any reason whatsoever the hire shall cease from the time of her putting back or putting into such port until she be again in the same or equivalent position and the voyage resumed therefrom.

In the event of loss of time either in port or at sea, or deviation upon the course of the voyage, caused by sickness or of accident to the crew or any person on board the Vessel other than the person placed on board by the Charterers or by reason of a presence on board and/or embarking and/or disembarking from the Vessel of any persons other than person placed on board by the Charterers or by deficiency and/or)

default of men and deficiency of stores and/or fresh water, strikes by Vessel's Officers and/or crew refusal by Vessel's Officers and/or crew to work and/or sail and/or permit the Vessel to perform, fire and/or breakdown and/or damages and/or defect in and/or lack of maintenance whether before delivery and/ or during the Charter Period to hull, cargo spaces, machinery and/or equipment, grounding unless in case of unsafe port and/or detention by average accidents to ship and/or cargo, or by any other cause affecting full working of the Vessel due to the Owners' fault, the payment of hire and overtime shall cease for all time thereby lost (including such time as may be needed to place the Vessel in equivalent position to that at which the Vessel commenced to be off-hire) and any item of expenditure incurred by reason thereof are to be for the Owners' account and may be deducted from the hire.

If upon the voyage the speed be reduced by defect in or breakdown of any part of her hull, machinery and/or equipment, Vessel to be off hire for the time so lost and any item of expenditure incurred by reason thereof to be for the Owners' account and may be deducted from hire.

Regarding the off hire calculation of drydocking, see Clause 73.

## 57. CONSECUTIVE OFF HIRE

If the Vessel will be off hire for longer than 50 days continuously without justifiable reason, the Charterers to have the option of cancelling this Charter. (see also Clause. 52)

## 58. ADDING OFF-HIRE PERIOD

The Charterers have the option to add all or any part of a period of more than five (5) days off-hire time (excepted periodical docking) incurred during this Charter Party to the Charter Period, however same to be declared at least five (5) months prior to definite redelivery of the Vessel.

## 59. OFF-HIRE DUE TO CREW

At loading and discharging port(s) any time lost by the Vessel for reason of all the crew not being on board when the Vessel is ready to sail to be for the Owners' account as well as expenses deriving therefrom.

## 60. ON/OFF HIRE SURVEY

Joint on/off hire survey to ascertain the Vessel's condition and quantity of bunkers R.O.B. shall be carried out on delivery and redelivery. Joint on/off hire survey to be carried out by one mutually agreed independent surveyor. Time and cost to be shared between the Owners and the Charterers.

## 61. OFF-HIRE DUE TO WATER POLLUTION

The Vessel shall be off hire during any time lost on account of the Vessel's non-compliance with government and/or safe regulations pertaining to water pollution.

## 62. BILL(S) OF LADING

The Vessel to use Charterers' Bill(s) of Lading or Bills) of Lading approved by the Charterers and/or sub-Charterers, which include New Both to Blame Collision Clause, New Jason Clause, CONWARTIME 2013, during the currency of this Charter Party.

If the Charterers failed to insert above wording in Bill(s) of Lading, the Charterers shall indemnify the Owners against any consequence arising out of not stating this wording in Bill(s) of Lading.

The Master to sign Bill(s) of Lading for cargo as presented in conformity with the Mate's or Tally Clerk's Receipt. However, at the Charterers' option the Charterers or their agents may sign Bill(s) of Lading on behalf of the Master always in conformity with the Mate's or Tally Clerk's Receipt.

All Bill(s) of Lading shall be without prejudice to this Charter and the Charterers shall indemnify the Owners from all consequences arising from the Charterers and/or their agents signing Bill(s) of Lading not in conformity with the remarks in Mate's Receipts or Tally Clerk's Receipt, also against all consequences or liabilities which may arise from any inconsistency between this Charter and any Bill(s) of Lading signed by the Charterers or their agents under this Charter.

## 63. NON PRODUCTION OF B/L

In case of no original Bill(s) of Lading being presented to the Master, the Owners and Master agree to release the entire cargo without presentation of the original Bill(s) of Lading against the Charterers' Letter of Indemnity(L01) as per the Owners' P&I Club wording signed by the Charterers. (the Charterers have the right to order the Master of the Vessel to discharge the relevant cargo, in which case the Owner/the Master have no responsibility caused of by non-presentation caused by Bill(s) of Lading.)

The Charterers shall indemnify the Owners in accordance with the Owners' P & I Club wording (attached as Annex B) against all consequences arising from the Owners conforming to the Charterers request in releasing cargo without original Bill(s) of Lading.

The Charterers shall surrender LOI with a copy of Bill(s) of Lading attached to the Owners strictly conforming with the Owners' P & I Club wording without bank guarantee.

The Charterers also indemnify the Owners and issue LOI in case of change of destination, splitting the Bill(s) of Lading (see Clause 83) and the Charterers issue such LOI at each occasion if it is required. The Owners to provide the Charterers with LOI standard wording prior to Vessel's delivery.

## 64. P&I CLUB

The Owners guarantee that the Vessel will on delivery be entered with and throughout the currency of this Charter Party remains entered with a Protecting and Indemnity Association, which is member of the International Group of Protecting and Indemnity Clubs. Entry shall include, but not be limited to, full cover for cargo claims of any nature.

The Charterers shall not be liable for any loss of life nor personal injury nor for any loss of damage arising out of an arrest, and seizure except the case caused by the Charterers or any other incident involving the Vessel or other fixed or floating objects, excluding the case due to unsafe port/berth/anchorage when such loss or damage would normally be a risk insured against under the rules of the said Protecting and Indemnity Association or by virtue of a policy of hull insurance affected on the institute time clauses at Lloyd.

The Charterers shall be entitled to the benefit of such entry to the extent that the Rules allow.

## 65. WAR CANCELLATION CLAUSE

If war or action hostilities break out between any two of the following countries: Great Britain, U.S.A., Russia, People's Republic of China. and Japan, both parties to have consult on cancellation/ continuation of this Charter on the basis of good will.

## 66. CARGO CLAIM

Cargo claims as between Owners and the Charterers shall be governed by, secured, apportioned and settled fully in accordance with the provisions of the Inter-Club New York Produce Exchange Agreement 1996 (as amended 2011), or any subsequent modification or replacement thereof. This clause shall take precedence over any other clause or clauses in this Charter Party purporting to incorporate any other version of the Inter-Club New York Produce Exchange Agreement into this Charter Party.

## 67. WAR RISK INSURANCE

The Charterers may trade the Vessel where war risk additional insurance premium is incurred subject to prior consent of the Owners, which not to be unreasonably withheld. The Charterers paying additional war risk insurances on the Vessel including blocking and trapping insurance and crew war bonus as supported by the Owners vouchers.

## 68. THE VESSEL'S CLASS/INSURANCE

The Owners undertake to maintain the Vessel classed NK or equivalent during the currency of this Charter. The Owners guarantee that the Vessel will be insured full protection in respect of collision liability, Hull and Machinery Insurance shall include "Bering Sea Clause".

## 69. OIL POLLUTION ETC

The Owners warrant that throughout the currency of this Charter they will comply fully with any legislation, rules and regulations enacted with respect to pollution of sea waters by oil or any other substances including any rules and/or regulations issued thereunder by any government thereof or other authorities. However, the Owners shall not be required to put the Vessel for the trade which request to provide financial responsibility whose limitation is not limited and/or unavailable through P&I Club which is by reason of new requirements of any states or local rules which include OPA 90.

In the event of significant improvement, structural changes, considerable expensive new equipment and/or additional insurance or certificates becoming necessary for the continued operation of the Vessel by reason or new requirements of any states or rules, regulations and/or ordinances introduced to the trade, the Charterers and the Owners shall discuss to mutually agree in compliance with such new requirements.

The Charterers shall be under no responsibility for all consequences (including loss of time) of oil or other pollution damage caused by the Owners' failure and the Owners' inability to comply with the above warranty.

Any loss of time incurred thereby shall be off hire.

## 70. BIMCO DISPUTE RESOLUTION CLAUSE

(a)* This Contract shall be governed by and construed in accordance with English law and any dispute arising out of or in connection with this Contract shall be referred to arbitration in London in accordance with the Arbitration Act 1996 or any statutory modification or re-enactment thereof save to the extent necessary to give effect to the provisions of this Clause.

The arbitration shall be conducted in accordance with the London Maritime Arbitrators Association (LMAA) Terms current at the time when the arbitration proceedings are commenced.

The reference shall be to three arbitrators. A Party wishing to refer a dispute to arbitration shall appoint its arbitrator and send notice of such appointment in writing to the other Party requiring the other Party to appoint its own arbitrator within fourteen (14) calendar days of that notice and stating that it will appoint its arbitrator as sole arbitrator unless the other Party appoints its own arbitrator and gives notice that it has done so within the fourteen (14) days specified. If the other Party does not appoint its own arbitrator and give notice that it has done so within the fourteen (14) days specified, the Party referring a dispute to arbitration may, without the requirement of any further prior notice to the other Party, appoint its arbitrator as sole arbitrator and shall advise the other Party accordingly. The award of the sole arbitrator shall be binding on both Parties as if the arbitrator had been appointed by agreement.

Nothing herein shall prevent the Parties agreeing in writing to vary these provisions to provide for the appointment of a sole arbitrator.

In cases where neither the claim nor any counterclaim exceeds the sum of USD 100,000 (or such other sum as the Parties may agree) the arbitration shall be conducted in accordance with the LMAA Small Claims Procedure current at the time when the arbitration proceedings are commenced.

(b) Deleted.

(c) Deleted.

(e) The parties may agree at any time to refer to mediation any difference and/or dispute arising out of or in connection with this Contract. In the case of any dispute in respect of which arbitration has been commenced under Sub-clause (a), (c) or (d), the following shall apply:

(i) Either Party may at any time and from time to time elect to refer the dispute or part of the dispute to mediation by service on the other Party of a written notice (the "Mediation Notice") calling on the other Party to agree to mediation.

(ii) The other Party shall thereupon within fourteen (14) calendar days of receipt of the Mediation Notice confirm that they agree to mediation, in which case the Parties shall thereafter agree a mediator within a further fourteen (14) calendar days, failing which on the application of either Party a mediator will be appointed promptly by the Arbitration Tribunal ("the Tribunal") or such person as the Tribunal may designate for that purpose. The mediation shall be conducted in such place and in accordance with such procedure and on such terms as the Parties may agree or, in the event of disagreement, as may be set by the mediator.

(iii) If the other Party does not agree to mediate, that fact may be brought to the attention of the Tribunal and may be taken into account by the Tribunal when allocating the costs of the arbitration as between the Parties.

(iv) The mediation shall not affect the right of either party to seek such relief or take such steps as it considers necessary to protect its interest.

(v) Either Party may advise the Tribunal that they have agreed to mediation. The arbitration procedure shall continue during the conduct of the mediation but the Tribunal may take the mediation timetable into account when setting the timetable for steps in the arbitration.

(vi) Unless otherwise agreed or specified in the mediation terms, each Party shall bear its own costs incurred in the mediation and the Parties shall share equally the mediator's costs and expenses.

(vii) The mediation process shall be without prejudice and confidential and no information or documents disclosed during it shall be revealed to the Tribunal except to the extent that they are disclosable under the law and procedure governing the arbitration.

## 71. LOADING/DISCHARGING IN U.S.A.

If the Vessel calls at any U.S. port for purpose of loading or discharging cargo, the Vessel's equipment shall comply with regulations established by U.S. Public Law 85-742 part 9 (Safety and Health Regulation for Longshoreman) which is valid at the delivery of the Vessel.

If Longshoremen are not permitted to work, due to failure of the Master and/or the Owners and/or the Owners' agents to comply with the aforementioned regulations, any delay resulting therefrom and any stevedore stand by time and other expenses involved shall be for the Owners' account. In the event of significant improvement, structural changes, expensive new equipment and/or additional insurance or certificates becoming necessary by amendment to the aforementioned regulation, the Charterers and the Owners shall discuss to mutually agree later about such new requirements.

## 72. LAY-UP

The Charterers may at any time, request the Owners to lay-up the Vessel.

Unless unforeseen events the lay-up period cannot be less than four (4) months. Beyond such period the Charterers may ask for re-commissioning which is to be effected as practically soon as possible.

Once lay-up decision has been notified to the Owners, the Owners will decide, in agreement with the Charterers, the place of laying-up. The cost of bringing the Vessel directly from the last discharging port to the lay-up place, and possible cost, duly evidenced, for the commissioning and re-commissioning of the Vessel will be for the Charterers' account. However drydocking expenses after lay-up, if necessary will be paid by the Charterers in so far as this drydocking takes place before the normal date and will be apportioned to the advance in time of the operation. For this purpose the Owners will indicate, before the lay-

up the date at which the next drydocking was scheduled.

During the lay-up period the bunker cost will be for the Charterers' account.

## 73. DRYDOCKING

No dry docking except in case of emergency.

## 74. PROLONGED PORT STAY CLAUSE

In the event of the Charterers ordering the Vessel to pots) where the Vessel's stay is extended for more than 25 consecutive days in Tropical Zone or 35 consecutive days in other area or to lay-up has to cause bottom fouling, the Charterers to provide underwater cleaning at their time and expense, otherwise the Owners' representation of the Vessel's speed and consumption to be null and void, effective from the Vessel's departure from such port(s), unless or until so cleaned.

## 75. EXCEEDING CHARTER PERIOD

The Charterers to have the option of exceeding the maximum Charter Period for the purpose of ending the last commenced trip provided the Charterers do not exceed the Charter Party by wilful miscalculation and/or if it is apparent before commencement of the last voyage, the Vessel will not be able to redeliver within Charter Party period.

Any time in excess of Charter Party period to be calculated at prevailing market rates but in any case not below the Vessel's present Charter Party rate.

## 76. TELECOMMUNICATION EQUIPMENT

The Vessel shall be equipped with INMARSAT C, other communication system in addition to telegraph and VHF telephone to comply with international regulations to allow the Vessel to communicate with land stations.

## 77. AGENTS

The Charterers agree that their officers and/or agents will deliver crew mail free of charge and assist the Master over minor ship's husbandry matters, debiting the Owners with the actual costs involved.

For major ship's husbandry matters such as dry-docking, changes of major part of crew etc. The Owners will appoint their own agents.

## 78. CHARTERERS' COLOUR

The Charterers to have the liberty of flying their own house flag and to have the liberty of painting the funnel in their own colours.

The time and expenses for painting the funnel initially and at any time during the currency of the Charter Period shall be for the Charterers' account, except at delivery from ex yard where the Owners will do o the Charterers behalf free of cost and time.

## 79.

Delete.

## 80. CLEARANCE WATER LINE TOP OF HATCH COAMING

The Charterers accepted the figure of water line top of hatch coaming.

The Owners will cooperate to their best of the capacity and will instruct the Master to give attention to the Charterers' requests, during the Charter Party period, to study all possible actions to lower this dimension in order to be able to use certain important berths around the world where similar size Vessels are usually fixed from or to.

However the Owners have full discretion whether they could apply any measure to be suggested/ requested by the Charterers or not, namely possibility of ballasting additional hold other than No. 3 hold is not be taken into account.

## 81. HIRE

Deleted (See Clause 4)

## 82. BIMCO CARGO FUMIGATION CLAUSE FOR CHARTER PARTIES

a) The Charterers shall have the option to fumigate the cargo in the Vessel's holds in port and/or at anchorage and/or in transit. Such fumigation shall be performed always in accordance with IMO Recommendations on the Safe Use of Pesticides in Ships applicable to the Fumigation of Cargo Holds, MSC.1/Circ.1264 (IMO Recommendations) and any subsequent revisions.

b) Fumigation shall be at the Charterers' risk and responsibility. Any costs and expenses incurred in connection with or as a result of such fumigation, including but not limited to gas detection equipment, respiratory protective equipment and crew training, shall be for the Charterers' account. The Charterers shall indemnify the Owners for any liabilities, losses or costs arising out of or resulting from cargo fumigation.

c) If local authorities or IMO Recommendations require the crew to be accommodated ashore as a result of fumigation ordered by the Charterers, all costs and expenses reasonably incurred in connection thereto including, but not limited to, transportation, accommodation and victualling shall be for Charterers' account.

d) At the discharging port or place all fumigant remains, residues and fumigation equipment shall be removed from the Vessel as soon as possible and disposed by the Charterers or their servants at Charterers' risk, responsibility, cost and expense in accordance with MARPOL Annex V or any other applicable rules relating to the disposal of such materials.

e)
*i) All time lost to the Owners in connection with or as a result of fumigation performed in accordance with sub-clause (a) shall be for Charterers' account and the Vessel shall not be off-hire.

f) The exercise by the Charterers of the option to fumigate the cargo under this Clause shall not be construed as evidence as to the condition of the cargo at the time of shipment, and the Master or the Owners are not to clause bills of lading by reason of fumigation only.

g) In the event of a conflict between the provisions of this Clause and any implied or express provision of the Charter Party, this Clause shall prevail to the extent of such conflict, but no further.

## 83. SPLIT OF BILLS OF LADING CLAUSE

The Owner can agree to split Bill(s) of Lading always provided that the Charterers issue LOI which should be complying with the Owners' standard form which is in ANNEX C.

## 84. DELIVERY NOTICE CLAUSE

-See Line 96.

## 85. ISM CODE CLAUSE

Deleted

---

CP ID: 205854   CP Date: 28 Apr 2023   Vessel: EASTERN HAWK

## 86. ADDITIONAL MOORING ROPES CLAUSE

The Owners are only required to supply and maintain on board the Vessel the number of mooring ropes as required by the Vessel's design and Class.

If additional mooring ropes and/or related equipment beyond the Vessel's design and Class requirements are necessary in order to comply with any port or other authority's requirements or local practice of the port etc, all costs of and associated with the purchase and supply of such additional mooring ropes and related equipment shall be for the Charterers' account and remain Charterers property.

## 87. SALES CLAUSE

The Owners may sell the Vessel to another party, which to be a company within the Owners' group, together with the Charter Party at any time during the course of the Charter Party, subject to the prior consent of the Charterers, which shall not be unreasonably withheld.

## 88.

Deleted.

## 89. SEA WAYBILL(S) CLAUSE

The Charterers have the option to issue Sea Waybill(s), instead of Bill(s) of Lading in case of Sea Waybill(s) being issued instead of Bill(s) of Lading, the cargo to be released at discharging port(s) as per the Charterers' written discharging instruction at the sole risk and responsibility of the Charterers.

The Charterers shall indemnify and hold the Owners harmless against any liability, loss, damage and/or expense caused to and/or incurred by the Owners by virtue of the Owners' complying with the Charterers' instruction for release of the cargo under the Sea Waybill(s) and/or by the use of Sea Waybill(s).

Furthermore the following steps shall be taken.

In case the Master is requested to authorize agents to sign Sea Waybill(s), copy of Sea Waybill(s) shall be sent on fax to the Master soonest possible, latest before arrival at the discharging port.

The Charterers shall give written discharging instruction including name of receivers, discharging port to the Master in time for arrival at the discharging port.

This clause to be applied for Japan discharging only.

## 90. BIMCO ISPS/MTSA CLAUSE FOR TIME CHARTER PARTIES 2005

(a) (i) The Owners shall comply with the requirements of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (BPS Code) relating to the Vessel and "the Company" (as defined by the ISPS Code). If trading to or from the United States or passing through United States waters, the Owners shall also comply with the requirements of the US Maritime Transportation Security Act 2002 (MTSA) relating to the Vessel and the "Owner" (as defined by the MTSA).

(ii) Upon request the Owners shall provide the Charterers with a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) and the full style contact details of the Company Security Officer (CSO).

(iii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Owners or the Company"/"Owner" to comply with the requirements of the ISPS Code/MTSA or this Clause shall be for the Owners' account, except as otherwise provided in this Charter Party.

(b)(i) The Charterers shall provide the Owners and the Master with their full style contact details and, upon request, any other information the Owners require to comply with the ISPS Code/MTSA. Where sub-letting is permitted under the terms of this

Charter Party, the Charterers shall ensure that the contact details of all sub-Charterers are likewise provided to the Owners and the Master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision:

'The Charterers shall provide the Owners with their full style contact details and, where subletting is permitted under the terms of the Charter Party, shall ensure that the contact details of all sub-Charterers are likewise provided to the Owners".

(ii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account, except as otherwise provided in this Charter Party.

(c) Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch services, Vessel escorts, security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the negligence of the Owners, Master or crew. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(d) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

## 91. BIMCO North American Advance Cargo Notification Clause for Time Charter Parties 2016

1. US Notification Requirements for Time Charter Parties

(a) If the Vessel loads or carries cargo destined for the US or passing through US ports in transit, the Charterers shall comply with the current US Customs regulations (19 CFR 4.7) or any subsequent amendments thereto and shall undertake the role of carrier for the purposes of such regulations and shall, in their own name, time and expense:

(i) Have in place a SCAC (Standard Carrier Alpha Code);
(ii) Have in place an ICB (International Carrier Bond);
(iii) Provide the Owners with a timely confirmation of (i) and (ii) above; and
(iv) Submit a cargo declaration by AMS (Automated Manifest System) to the US Customs and provide the Owners at the same time with a copy thereof.

(b) The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with any of the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the Vessel shall remain on hire.

(c) If the Charterers' ICB is used to meet any penalties, duties, taxes or other charges which are solely the responsibility of the Owners, the Owners shall promptly reimburse the Charterers for those amounts.

(d) The assumption of the role of carrier by the Charterers pursuant to this Clause and for the purpose of the US Customs Regulations (19 CFR 4.7) shall be without prejudice to the identity of carrier under any bill of lading, other contract, law or regulation.

2. Canadian Notification Requirements for Time Charter Parties
(a) As between Owners and Charterers, Charterers shall be deemed to be the Conveyance Operating Carrier for the purposes of the Canada Customs Act and any related regulations, memorandums or notices issued by the Canada Border Services Agency ("CBSA").

(b) Subject to sub-clause (c) below, Charterers will be responsible for obtaining a Marine Carrier Code (Bonded or Non-Bonded) as may be required and for providing the CBSA with the Advance Commercial Information by Electronic Data

 

Interchange or otherwise on a timely basis.

(c) When the Vessel calls at a port in Canada other than as instructed by Charterers, Owners shall provide Charterers with all information necessary for the timely and accurate submission of Advance Commercial Information to the CBSA.

(d) Each party shall indemnify the other party for any and all fines, penalties, expenses, loss, damage, delay or any other claim, including attorney's fees, arising from its failure to comply with this clause.

(e) For the avoidance of doubt, nothing contained in this clause is intended to vary any other provision of this charter as to responsibility for cargo and identity of carrier.

## 92. CHANGE IN APPLICABLE LAWS AND REGULATIONS

Where and when new circumstances and/or situations and/or new regulations and/or legislation arise, after the finalization of this Charter Party, that may affect the trading of this Vessel, either the Charterers or the Owners can propose clause(s) that should be inserted to cover the new circumstances/situation/ legislation or regulation.
Charterers and Owners to discuss such new clause (s) in good faith and are mutually bound to agree a reasonable wording.

## 93. SUBJECT (N/A)

This Charter Party is subject to successful delivery of the Vessel from the Builder to Owners.

## 94. CHANGE IN POLITICAL SITUATIONS

Should the political, social and/or other situation for a normal trading of the Vessel in the allowed or excluded countries/area change, then such country(ies)/area(s) shall be excluded or allowed through the mutual discussion, agreement and conditions if any.

## 95. BUNKER FUEL SULPHUR CONTENT CLAUSE

(a) Without prejudice to anything else contained in this Charter Party, the Charterers shall supply fuels, of such specifications and grades to permit the Vessel, at all times, to comply with the maximum sulphur content requirements of any emission control zone when the Vessel is ordered to trade within that zone. The Charterers also warrant that any bunker suppliers, bunker craft operators and bunker surveyors used by the Charterers to supply such fuels shall comply with Regulations 14 and 18 of MARPOL Annex VI, including the Guidelines in respect of sampling and the provision of bunker delivery notes. The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising or resulting from the Charterers' failure to comply with this Sub-clause (a).

(b) Provided always that the Charterers have fulfilled their obligations in respect of the supply of fuels in accordance with Sub-clause (a), the Owners warrant that:
(i) the Vessel shall comply with Regulations 14 and 18 of MARPOL Annex VI and with the requirements of any emission control zone; and
(ii) the Vessel shall be able to consume fuels of the required sulphur content when ordered by the Charterers to trade within any such zone.
Subject to having supplied the Vessel with fuels in accordance with Sub-clause (a), the Charterers shall not otherwise be liable for any loss, delay, fines, costs or expenses arising or resulting from the Vessel's failure to comply with Regulations 14 and 18 of MARPOL Annex VI.
It is expressly agreed that, Charterers and Owners shall cooperate in advanced planning of bunker replenishment in order to segregate fuels which may be ordered by Charterers specifically for the purpose of steaming in SECA.

(c) For the purpose of this Clause, "emission control zone" shall mean zones as stipulated in MARPOL Annex VI and/or zones regulated by regional and/or national authorities such as, but not limited to, the EU and the US Environmental Protection Agency.

SECA = Sulphur Emission Control Area

## 96. ISM CODE COMPLIANCE

Head Owners as named in this Charter and/or their managers (Owners) shall comply in all respects with the requirements of this Code, IMO Resolution A741 of 4th November 1993 as subsequently incorporated into the SOLAS (1994) Convention.
The Owners further warrant the Vessel shall comply and keep on board a valid Document of Compliance and Safety Management Certificate which certificates shall be maintained throughout the Charter Period. If required by the Charterers, the Owners to provide copies of such 'DOC' and `SMC'.
The Owners are aware of IMO Resolution and Annex A713 (17) of 6th November 1991, and the Owners warrant that the Vessel, Master and crew shall comply with relevant recommendations throughout the currency of this Charter.

## 97. Arrest Clause

1.1 From the date of this fixture until the Vessel's re-delivery, the Owners warrant that there are and will be no outstanding claims against them or the Vessel and/or any Arrest orders, caveats, charges, encumbrances ( or their equivalent) registered against the Vessel which might result in her detention and/ or otherwise interfere with the Charter service (collectively defined as an "Arrest")

1.2 Notwithstanding any other contrary terms in this Charter, if the Vessel is subject to an Arrest as defined above, the following provisions shall apply, in case the arrest is caused by the Owners

1.2.1 The Owners shall immediately notify the Charterers of the Arrest, and provide them with full details and documents relating to the Arrest;

1.2.2 An arrest prior to the cancelling date will invalidate any previous Notice of Delivery and/ or Readiness. If the Vessel is not released before the cancelling date, the Charterers shall have the right to cancel the Charter.

1.2.3 If the Vessel is subject to Arrest after the delivery into Charter service:

1.2.3.1 The Owners shall immediately take all necessary steps to release her, including providing security by way of an IG P&I Club LOU or first class London bank guarantee;

1.2.3.2 The Charterers' obligation to pay any sums whatsoever that would otherwise be payable by a certain date, including hire, shall be immediately suspended until the Vessel is released. Bunkers consumed whilst the Vessel is subject to arrest shall be for the Owners' account.

1.3 The Owners shall hold harmless and indemnify the Charterers against all liabilities, costs, damages and losses of whatsoever nature (including any direct, indirect or consequential losses, loss of profit and all interest, penalties and legal costs and all other professional costs) incurred by the Charterers as a result of or in connection with the Arrest.

## 98. BIMCO CONWARTIME 2013 War Risks Clause for Time Chartering

(a) For the purpose of this Clause, the words:

(i) "Owners" shall include the shipOwners, bareboat Charterers, disponent Owners, managers or other operators who are charged with the management of the Vessel, and the Master; and

(ii) "War Risks" shall include any actual, threatened or reported:

war, act of war, civil war or hostilities; revolution; rebellion; civil commotion; warlike operations; laying of mines; acts of piracy and/or violent robbery and/or capture/seizure (hereinafter "Piracy"); acts of terrorists; acts of hostility or malicious damage; blockades (whether imposed against all Vessels or imposed selectively against Vessels of certain flags or Ownership, or

against certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group, or the government of any state or territory whether recognised or not, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or may become dangerous to the Vessel, cargo, crew or other persons on board the Vessel.

(b) The Vessel shall not be obliged to proceed or required to continue to or through, any port, place, area or zone, or any waterway or canal (hereinafter "Area"), where it appears that the Vessel, cargo, crew or other persons on board the Vessel, in the reasonable judgement of the Master and/or the Owners, may be exposed to War Risks whether such risk existed at the time of entering into this Charter Party or occurred thereafter. Should the Vessel be within any such place as aforesaid, which only becomes dangerous, or may become dangerous, after entry into it, the Vessel shall be at liberty to leave it.

(c) The Vessel shall not be required to load contraband cargo, or to pass through any blockade as set out in Sub-clause (a), or to proceed to an Area where it may be subject to search and/or confiscation by a belligerent.

(d) If the Vessel proceeds to or through an Area exposed to War Risks, the Charterers shall reimburse to the Owners any additional premiums required by the Owners' insurers and the costs of any additional insurances that the Owners reasonably require in connection with War Risks.

(e) All payments arising under Sub-clause (d) shall be settled within fifteen (15) days of receipt of Owners' supported invoices or on redelivery, whichever occurs first.

(f) If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an Area which is dangerous in the manner defined by the said terms, then the actual bonus or additional wages paid shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first.

(g) The Vessel shall have liberty:

(i) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the government of the nation under whose flag the Vessel sails, or other government to whose laws the Owners are subject, or any other government of any state or territory whether recognised or not, body or group whatsoever acting with the power to compel compliance with their orders or directions;

(ii) to comply with the requirements of the Owners' insurers under the terms of the Vessel's insurance(s);

(iii) to comply with the terms of any resolution of the Security Council of the United Nations, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

(iv) to discharge at any alternative port any cargo or part thereof which may expose the Vessel to being held liable as a contraband carrier;

(v) to call at any alternative port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment, detention or similar measures.

(h) If in accordance with their rights under the foregoing provisions of this Clause, the Owners shall refuse to proceed to the loading or discharging ports, or any one or more of them, they shall immediately inform the Charterers. No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice. All costs, risk and expenses for the alternative discharge shall be for the Charterers' account.

(i) The Charterers shall indemnify the Owners for claims arising out of the Vessel proceeding in accordance with any of the provisions of Sub-clauses (b) to (h) which are made under any bills of lading, waybills or other documents evidencing

contracts of carriage.

(j) When acting in accordance with any of the provisions of Sub-clauses (b) to (h) of this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party.

## 99. BIMCO Piracy Clause for Time Charter Parties 2013

(a) The Vessel shall not be obliged to proceed or required to continue to or through, any port, place, area or zone, or any waterway or canal (hereinafter "Area") which, in the reasonable judgement of the Master and/or the Owners, is dangerous to the Vessel, cargo, crew or other persons on board the Vessel due to any actual, threatened or reported acts of piracy and/or violent robbery and/or capture/seizure (hereinafter "Piracy"), whether such risk existed at the time of entering into this Charter Party or occurred thereafter. Should the Vessel be within any such place as aforesaid which only becomes dangerous, or may become dangerous, after entry into it, the Vessel shall be at liberty to leave it.

(b) If in accordance with sub-clause (a) the Owners decide that the Vessel shall not proceed or continue to or through the Area they must immediately inform the Charterers. The Charterers shall be obliged to issue alternative voyage orders and shall indemnify the Owners for any claims from holders of the Bills of Lading or third parties caused by waiting for such orders and/or the performance of an alternative voyage. Any time lost as a result of complying with such orders shall not be considered off-hire.

(c) If the Owners consent or if the Vessel proceeds to or through an Area exposed to the risk of Piracy the Owners shall have the liberty:

(i) to take reasonable preventative measures to protect the Vessel, crew and cargo including but not limited to re-routeing within the Area, proceeding in convoy, using escorts, avoiding day or night navigation, adjusting speed or course, or engaging security personnel and/or deploying equipment on or about the Vessel (including embarkation/disembarkation).

(ii) to comply with the requirements of the Owners' insurers under the terms of the Vessel's insurance(s);

(iii) to comply with all orders, directions, recommendations or advice given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group (including military authorities) whatsoever acting with the power to compel compliance with their orders or directions; and

(iv) to comply with the terms of any resolution of the Security Council of the United Nations, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

and the Charterers shall indemnify the Owners for any claims from holders of Bills of Lading or third parties caused by the Vessel proceeding as aforesaid, save to the extent that such claims are covered by additional insurance as provided in sub-clause (d)(iii).

(d) Costs
(i) If the Vessel proceeds to or through an Area where due to risk of Piracy additional costs will be incurred including but not limited to additional personnel and preventative measures to avoid Piracy, such reasonable costs shall be for the Charterers' account. Any time lost waiting for convoys, following recommended routeing, timing, or reducing speed or taking measures to minimise risk, shall be for the Charterers' account and the Vessel shall remain on hire;

(ii) If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then the actual bonus or additional wages paid shall be reimbursed to the Owners by the Charterers;

(iii) If the Vessel proceeds to or through an Area exposed to the risk of Piracy, the Charterers shall reimburse to the Owners any additional premiums required by the Owners' insurers and the costs of any additional insurances that the Owners reasonably require in connection with Piracy risks which may include but not be limited to War Loss of Hire and/or maritime

K&R.

(iv) All payments arising under Sub-clause (d) shall be settled within fifteen (15) days of receipt of Owners' supported invoices or on redelivery, whichever occurs first.

(e) If the Vessel is attacked by pirates any time lost shall be for the account of the Charterers and the Vessel shall remain on hire.

(f) If the Vessel is seized by pirates the Owners shall keep the Charterers closely informed of the efforts made to have the Vessel released. The Vessel shall remain on hire throughout the seizure and the Charterers' obligations shall remain unaffected, except that hire payments shall cease as of the ninety-first (91st) day after the seizure until release. The Charterers shall not be liable for late redelivery under this Charter Party resulting from the seizure of the Vessel.

(g) If in compliance with this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party. In the event of a conflict between the provisions of this Clause and any implied or express provision of the Charter Party, this Clause shall prevail.

## 100. BIMCO Sanctions Clause for Time Charter Parties

a) The Owners shall not be obliged to comply with any orders for the employment of the Vessel in any carriage, trade or on a voyage which, in the reasonable judgment of the Owners, will expose the Vessel, Owners, managers, crew, the Vessel's insurers, or their re-insurers, to any sanction or prohibition imposed by any State, Supranational or International Governmental Organization.

b) If the Vessel is already performing an employment to which such sanction or prohibition is subsequently applied, the Owners shall have the right to refuse to proceed with the employment and the Charterers shall be obliged to issue alternative voyage orders within 48 hours of receipt of Owners' notification of their refusal to proceed. If the Charterers do not issue such alternative voyage orders the Owners may discharge any cargo already loaded at any safe port (including the port of loading). The Vessel to remain on hire pending completion of Charterers' alternative voyage orders or delivery of cargo by the Owners and Charterers to remain responsible for all additional costs and expenses incurred in connection with such orders/delivery of cargo. If in compliance with this Sub-clause (b) anything is done or not done, such shall not be deemed a deviation.

c) The Charterers shall indemnify the Owners against any and all claims whatsoever brought by the Owners of the cargo and/or the holders of Bills of Lading and/or sub-Charterers against the Owners by reason of the Owners' compliance with such alternative voyage orders or delivery of the cargo in accordance with Sub-clause (b).

d) The Charterers shall procure that this Clause shall be incorporated into all sub-charters and Bills of Lading issued pursuant to this Charter Party.

## 101. New Jason Clause

In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Carrier is not responsible, by statute, contract or otherwise, the goods, Shippers, Consignees or Owners of the goods shall contribute with the Carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods.

If a salving ship is owned or operated by the Carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the Carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, Shippers, Consignees or Owners of the goods to the Carrier before delivery.

## 102. BIMCO Both-to-Blame Collision Clause

If the Vessel comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, Mariner, Pilot or the servants of the Carrier in the navigation or in the management of the Vessel, the Owners of the cargo carried hereunder will indemnify the Carrier against all loss or liability to the other or non- carrying ship or her Owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the Owners of said cargo, paid or payable by the other or non-carrying ship or her Owners to the Owners of said cargo and set-off, recouped or recovered by the other or non-carrying ship or her Owners as part of their claim against the carrying Vessel or Carrier.

The foregoing provisions shall also apply where the Owners, operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect of a collision or contact.

## 103. Paramount Clause

The International Convention for the Unification of Certain Rules of Law relating to Bills of Lading signed at Brussels on 25 August 1924 ("the Hague Rules") as amended by the Protocol signed at Brussels on 23 February 1968 ("the Hague-Visby Rules") and as enacted in the country of shipment shall apply to this Contract. When the Hague-Visby Rules are not enacted in the country of shipment, the corresponding legislation of the country of destination shall apply, irrespective of whether such legislation may only regulate outbound shipments.

When there is no enactment of the Hague-Visby Rules in either the country of shipment or in the country of destination, the Hague-Visby Rules shall apply to this Contract save where the Hague Rules as enacted in the country of shipment or if no such enactment is in place, the Hague Rules as enacted in the country of destination apply compulsorily to this Charter Party.

The Protocol signed at Brussels on 21 December 1979 ("the SDR Protocol 1979") shall apply where the Hague-Visby Rules apply, whether mandatorily or by this Charter Party.

The Owners shall in no case be responsible for loss of or damage to cargo arising prior to loading, after discharging, or while the cargo is in the charge of another carrier, or with respect to deck cargo and live animals.

## 104. Scrubber Clause

1. This Vessel is fitted with open loop type sox scrubber (hereinafter "scrubber").

2. Bunker saving profit share formula as follows:
A) where the Charterers are able to stem heavy fuel oil (3.5 % or less sulphur content bunker grade as defined in the Charter Party, hereinafter called "HFO") in place of IMO 2020 compliant fuel (0.5% or less sulphur content, of which spec to be defined by IMO regulation, hereinafter called "IMO 2020 compliant fuel"), the Charterers to provide the Owners evidence of the HFO purchase price. For calculation of the bunker saving profit the IMO 2020 compliant fuel price to be the Platts price of the day Charterers purchased the HFO at the place where the HFO is to be delivered.

B) The Charterers to reimburse the Owners 100% in the firm period and the optional periods for "the difference in price between of HFO and IMO 2020 compliant fuel" as detailed in para 3.(a) x (multiply) "the volume of bunkers delivered" with the next hire payment after the relevant bunker were delivered to the Vessel. The Charterers shall inform the formula and the result of the amount of profit for the Owners in the hire statement together with a copy of the actual voucher of purchasing the said HFO and IMO 2020 compliant fuel, market price quoted by reliable sources such as Platts or other relevant market report in the relevant port.

C) Should the Vessel trade to an ECA zone requiring maximum 0.1% sulphur content fuel, the Owners warrant the Vessel's scrubber is able to meet this requirement consuming HFO. The Charterers in this instance to credit the Owners for "the difference in price between 0.5% and 0.1% sulphur content fuels x (multiply) "bunkers actually consumed in the ECA zone". The difference in price between 0.5% and 0.1% sulphur content fuels to be calculated on basis of the Platts price 0.5% fuel applicable for the day and place of Charterers last HFO purchase prior to the Vessel entered the ECA zone and the 0.1%

sulphur content fuel price of Charterers last purchase prior to the Vessel entered the ECA zone.

The Charterers shall inform the formula and the result of the amount of profit share for the Owners in the hire statement together with a copy of their last purchase invoice of 0.1% sulphur fuel, the 0.5% sulphur fuels price to be the Platts price valid at the place and date when and where Charterers purchased HFO last before entering the relevant ECA zone.

In case the Vessel performs a voyage for account of a t/c sub-Charterer, and is supplied with bunkers by the sub-Charterer, then the Platts prices shall apply for HFO, IMO 2020 compliant fuel and 0.1% sulphur content fuel for the reason that no physical purchase prices would be made available to ADMINTERMARE by the sub-Charterer.

If the Vessel, after such t/c relet, continues to perform Charterers voyage(s), then the sub-Charter Party price for those redelivery bunkers from sub-time Charterers to apply for calculating of all scrubber profit until Charterers supplied bunkers to the Vessel for their account.

1. [Scrubber Technical Clause]
i. Owner warrants that it has exercised due diligence at the time of delivery to make the scrubber operational, which shall mean:

(i) Owner has all necessary permits for the scrubber, and
(ii) It shall be capable of reducing emissions to comply with MARPOL annex vi, and
(iii) Compliant with all applicable regulations and requirements of international, national or regional authorities.

ii. If the Charterers cannot burn high sulfur bunker due to the scrubber malfunction, the Charterers shall not ask the Owners to compensate the extra bunker purchase price in any case.

iii. All scrubber consumables and disposal of scrubber waste/water shall be for Owner's account.

2. All other terms and conditions of the Charter Party shall remain unaltered.

## 105.

Notwithstanding any other provision in the Charter Party, Owners and Charterers warrant that neither they nor the Vessel is owned, beneficially owned or controlled by persons or entities which are or may be blacklisted by US treasury dept office of foreign assets control (OFAC), nor subject to sanctions by US, EU, UN or other governmental authorities. In the event of the Vessel, its cargo, and/or crew being subjected to any arrest, seizure, sanctions, delays, discrimination, blacklisting or any other difficulties whatsoever arising from the nationality and/or citizenship of Owners, its crew or the Vessel's flag or previous port calls, or of Charterers, then the party responsible shall be liable for hire, bunkers consumed and all fines, costs and expenses incurred as a result. In the event of any charter hire payment being seized, delayed, impounded or otherwise impeded in any manner whatsoever by US, EU, UN or other governmental authorities then the hire is deemed paid and Owners may not exercise their right of withdrawal and terminate the Charter Party. If at any time it becomes known that Owners are in breach of warranty then Charterers shall be entitled to terminate this Charter Party at any time thereafter. Termination of the Charter Party in accordance with this clause is without prejudice to and shall not affect any rights, accrued or otherwise, that either party may have against the other.

## 106.

It is understood and agreed that in case of conflict between recap terms and base Charter Party, recap terms will override the base Charter Party.
In case of conflict between preamble and riders, riders to prevail over preamble.

**ANNEX A**

MV EASTERN HAWK

MV EASTERN HAWK BUILT NOVEMBER 2020 IMABARI SHIPBUILDING
CLASS : NK
DESCRIPTIVE NOTE : STRENGTHENED FOR HEAVY CARGO LOADING WHERE HOLDS NOS. 2 & 4
MAY BE EMPTY
FLAG : SINGAPORE
LENGTH OVERALL : 179.97 M
BREADTH (MLD.) : 29.80 M
SCANTLING DRAFT (MLD.) : ABT. 10.54 M
DEAD WEIGHT (AT SCANTLING DRAFT) : ABT. 37,520 MT
TPC : 48,6
NO. OF CARGO HOLDS/HATCHES : FIVE (5)/FIVE (5)
HOLD CAPACITY (GRAIN) : 46,995 M3
HATCH SIZE : NO.1 ABT. 15.87 M (L) X ABT. 17.16 M (B)
NO.2 - 5 ABT. 20.04 M (L) X ABT. 20.02 M (B)
HATCH COVER : END FOLDING TYPE, WEATHERTIGHT STEEL HATCH COVER
DECK CRANE : ELECTRO-HYDRAULIC DRIVEN, SINGLE DECK CRANE
4 X 30.5MT SWL
SCRUBBER FITTED : YES, OPEN LOOP
A60/CO2: FITTED
FULLY LOGS FITTED: YES
SPEED / CONSUMPTION
IN GOOD WEATHER CONDITION I.E. IN WINDS UP TO BEAUFORT FORCE 4 AND HEIGHT OF SWELL UP TO DOUGLAS SCALE 3, NO ADVERSE CURRENT.
BALLAST CONDITION LADEN CONDITION
ABOUT 14.3 KNOTS ABOUT 13.7 KNOTS
CONSUMPTION AT SEA :
FOR MAIN ENGINE AT SEA: ABOUT 21.9MT VLSFO
FOR AUX ENGINE AT SEA : ABOUT 1.7MT VLSFO + ABOUT 0.2MT LSG

ECO SPEED/CONSUMPTION (GUARANTEED)
BALLAST CONDITION ABOUT 13.00 KNOTS ABOUT 15.0 MT
LADEN CONDITION ABOUT 12.00 KNOTS ABOUT 14.4 MT
CONSUMPTION AT SEA:
FOR AUX ENGINE AT SEA : ABOUT 1.7MT VLSFO + ABOUT 0.2MT LSG

IN PORT CONSUMPTION :
WHEN IDLE : ABOUT 2.6MT VLSFO + ABOUT 0.2MT LSG
WHEN WORKING (24 HOURS) : ABOUT 4.6MT VLSFO + ABOUT 0.4MT LSG

ALL FIGURES "ABOUT"

+++

-OWNERS TO PROVIDE BALTIC QUESTIONNAIRE WHICH WILL FORM PART OF THE CHARTER PARTY, ALONG WITH VESSEL CERTIFICATES AND ALL INFORMATION SUPPLIED TO NOT CONFLICT WITH DESCRIPTION ABOVE.

-LAST 5 CARGOES: LAST CARGOES: CONCENTRATES, LOGS, CEMENT, LOGS, CEMENT.
-VESSEL CONTACT DETAILS AND INSTRUCT MASTER TO REPLY TO CHARTERERS PROMPTLY ON STOW INSTRUCTIONS UPON FIXING MAIN TERMS.

HEAD OWNERS FULL STYLE INCLUDING MANAGERS.
HEADOWRS:
GOODWILL MARITIME PTE. LTD.
3 ANSON ROAD #08-01
SPRINGLEAF TOWER
SINGAPORE 079909

DISPONENT OWNERS (CHARTE PARTY COUNTERPART):
ADMINTERMARE, A DIVISION OF
ADM INTERNATIONAL SÀRL
A ONE BUSINESS CENTER
LA PIÈCE 3
CH-1180 ROLLE • SWITZERLAND
REGISTERED IN SWITZERLAND N° CH-550.1.052.13-9
VAT N° CHE-113.903.886 TVA

-LAST TWO SOF'S TO CHECK PERFORMANCE OF VESSEL CRANES/GRABS TO BE ADVISED.
-TYPE/MAKE OF GRABS OR TYPE OF GRABS HOOK CONNECTION - CHECK REVERT
-VESSEL'S MAX BUNKER CAPACITY EXCLUDING UNPUMPABLES - CHECK REVERT
-VESSEL'S MAXIMUM CARGO INTAKE IN BELOW FORMAT PRIOR TO SUB TIME (SENT IN SEPARATE EMAIL)

CARGO : 36000.00 MT
IFO : 845.00 MT
MDO : 71.00 MT
FW : 120.00 MT
CONSTANT : 364.00 MT
BALLAST (IF ANY): 120.00 MT
---------------------
TOTAL DW : 37520.00 MT

LOADING PORT: ULSAN
DISCHARGING PORT: HOUSTON
CARGO: AMMONIUM SULFATE
STOWAGE FACTOR = 42
QUANTITY: 27500MT
BUNKERS AS ONBOARD

THE FOLLOWING TO BE PROVIDED:
-CREW LIST (WITH EMBARKATION DATE)
-IF CREW VACCINATED / WHAT VACCINATIONS TAKEN
-Q88 / BALTIC QUESTIONNAIRE
-GA PLAN
-MLC
-SMC
-ISSC
-DOC
-P&I
-H&M

- OWNERS CONFIRM:
A) VESSEL/CREW IS ITF OK OR EQUIVALENT.
B) VESSEL IS AHL FTD.
C)VESSEL IS ISM ACCREDITED.

MAERSK BROKER
SHIPBROKERS SINCE 1914

D) ADM NOT RIGHSHIP MEMBER BUT OWS DOING BEST POSSIBLE ACTION.

E) VESSEL IS FULLY SUITABLE FOR CHARTERERS INTENDED TRADE.

F) VESSEL IS A SINGLEDECK SELFTRIMMING BULKCARRIER WITH NO CENTERLINE BULKHEADS OR ANY OBSTRUCTIONS ON DECKS OR IN HOLDS INTERFERING WITH LOADING/DISCHARGING OPERATIONS AND/OR OBSTRUCTING USE OF BULLDOZERS/PAYLOADERS. - ONLY COLLAPSIBLE SANCTIONS

G)VESSEL IS CLASSED TO LLOYDS 100+A1 OR EQUIVALENT CLASS & NOTATION WITH AN IACS CLASSIFICATION SOCIETY

H)VESSEL IS P&I COVERED WITH AN IGA P&I CLUB.

I) VESSEL IS H&M INSURED.

J) VESSEL COMPLIES WITH THE ISPS CODE AND HAS A VALID ISPS CERTIFICATE ON BOARD AND VESSEL SHALL REMAIN SO THROUGH THE CURRENCY OF THIS CHARTER PARTY.

K) CHARTERERS TO HAVE FREE USE OF VESSELS GEARS/GRABS AND HER GEARS/GRABS ARE IN GOOD WORKING ORDER UPON DELIVERY AND WILL REMAIN SO THROUGH THE DURATION OF THE CHARTER PARTY, AS WELL AS SUITABLE IN ALL RESPECTS TO LOAD/DISCHARGE ANY PERMITTED CARGO. IN CASE OF BREAKDOWN OF VESSEL CRANES/GRABS OR INSUFFICIENT POWER TO OPERATE THEM, VESSEL TO BE OFF-HIRED PRORATA TO NUMBER OF WORKABLE HOLDS. ANY/ALL DIRECTLY RELATED EXPENSE FACED BY CHARTERERS COMPARED TO IF THE GEARS/GRABS WOULD HAVE BEEN WORKING AS DESCRIBED TO BE FOR OWNERS' ACCOUNT. OWNERS TO TAKE IMMEDIATE MEASURES TO RECTIFY THE SITUATION TO AVOID TIME LOSS AND MINIMISE COST FOR ALL THE PARTIES. OWNERS ALSO CONFIRM THAT THERE HAS BEEN NO BREAKDOWN OF VESSEL CRANES/GRABS IN LAST 5 VOYAGES.

L) DELETED

M) DELETED

N) OWNERS GUARANTEE THAT THE VESSEL IS, AND SHALL REMAIN, FREE FROM ANY OBLIGATION, ENCUMBRANCE, CLAIM, OR LIEN THAT WOULD INTERFERE IN ANY WAY WITH THE VESSEL'S PERFORMANCE AND/OR DELIVERY OF CARGO WITH THE UTMOST DISPATCH; AND THAT ALL BUNKERS RECEIVED ON BOARD THE VESSEL PRIOR TO THE COMMENCEMENT OF THIS CHARTER PARTY HAVE BEEN FULLY PAID. IN THE EVENT THE VESSEL IS ARRESTED OR DETAINED DURING THE CURRENCY OF THIS CHARTER PARTY DUE TO OWNER'S BREACH OF THIS CLAUSE, THEN OWNERS SHALL TAKE IMMEDIATE ACTION TO RELEASE THE VESSEL AND SHALL REMAIN FULLY RESPONSIBLE FOR ANY RESULTING COSTS OR DAMAGES CAUSED BY ANY INTERRUPTION OF THE VESSEL'S PERFORMANCE. OWNERS CONFIRM THAT CHARTERERS MAY PROCURE BUNKERS, SUPPLIES, NECESSARIES, OR SERVICES FOR THE VESSEL ON THEIR OWN (CHARTERER'S) ACCOUNT. IF REQUESTED, CHARTERERS WILL PROVIDE EVIDENCE OF PAYMENT THEREOF TO THE OWNERS AS SOON AS POSSIBLE AFTER THE DUE DATE OF PAYMENT FOR THE SUPPLIES. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS CHARTERPARTY, CHARTERERS AND SUPPLIERS SHALL NOT BE REQUIRED TO SIGHT, ACKNOWLEDGE, OR SIGN ANY NON-LIEN NOTICE.

O) OWNERS CONFIRM VESSEL HAS NOT CALLED IRAN IN THE LAST 36 MONTHS.

P) OWNERS CONFIRM THE VESSEL HAS HAD NO ACCIDENTS IN THE LAST 12 MONTHS.

-ITINERARY: ETB 30 APRIL (2HOLDS REMAINING FOR THIS 2ND PORT) ETC 1ST MAY.

OWNERS BANKING DETAILS:
ACCOUNT NO: 30744326
BENEFICIARY NAME: ADM INTERNATIONAL SARL
ACCOUNT CURRENCY: USD
BIC / SWIFT: CITIUS33
ABA:
BANK NAME 021000089
CITIBANK, N.A.
BRANCH: NEW YORK
ADDRESS1: 111 WALL STREET
POSTAL CODE: 10043
CITY: NEW YORK
COUNTRY: UNITED STATES

**ANNEX B**

STANDARD FORM LETTER OF INDEMNITY TO BE GIVEN IN RETURN FOR DELIVERING CARGO WITHOUT PRODUCTION OF THE ORIGINAL BILL OF LADING

[insert date]


To : [insert name of Owners]
The Owners of the [insert name of ship]
[insert address]


Dear Sirs


Ship: [insert name of ship]
Voyage: [insert load and discharge ports as stated in the bill of lading]
Cargo: [insert description of cargo]
Bill of lading: [insert identification numbers, date and place of issue]


The above cargo was shipped on the above ship by [insert name of shipper] and consigned to [insert name of consignee or party to whose order the bill of lading is made out, as appropriate] for delivery at the port of [insert name of discharge port stated in the bill of lading] but the bill of lading has not arrived and we, [insert name of party requesting delivery], hereby request you to deliver the said cargo to [insert name of party to whom delivery is to be made] or to such party as you believe to be or to represent [insert name of the specific party] or to be acting on behalf of [insert name of the specific party] at [insert place where delivery is to be made] without production of the original bill of lading.


In consideration of your complying with our above request, we hereby agree as follows :-


1. To indemnify you, your servants and agents and to hold all of you harmless in respect of any liability, loss, damage or expense of whatsoever nature which you may sustain by reason of delivering the cargo in accordance with our request.

2. In the event of any proceedings being commenced against you or any of your servants or agents in connection with the delivery of the cargo as aforesaid, to provide you or them on demand with sufficient funds to defend the same.

3. If, in connection with the delivery of the cargo as aforesaid, the ship, or any other ship or property in the same or associated Ownership, management or control, should be arrested or detained or should the arrest or detention thereof be threatened, or should there be any interference in the use or trading of the Vessel (whether by virtue of a caveat being entered on the ship's registry or otherwise howsoever), to provide on demand such bail or other security as may be required to prevent such arrest or detention or to secure the release of such ship or property or to remove such interference and to indemnify you in respect of any liability, loss, damage or expense caused by such arrest or detention or threatened arrest or detention or such interference, whether or not such arrest or detention or threatened arrest or detention or such interference may be justified.

4. If the place at which we have asked you to make delivery is a bulk liquid or gas terminal or facility, or another ship, lighter or barge, then delivery to such terminal, facility, ship, lighter or barge shall be deemed to be delivery to the party to whom we have requested you to make such delivery.

5. As soon as all original bills of lading for the above cargo shall have come into our possession, to deliver the same to you, or otherwise to cause all original bills of lading to be delivered to you, whereupon our liability hereunder shall cease.

6. The liability of each and every person under this indemnity shall be joint and several and shall not be conditional upon your proceeding first against any person, whether or not such person is party to or liable under this indemnity.

7. This indemnity shall be governed by and construed in accordance with English law and each and every person liable under this indemnity shall at your request submit to the jurisdiction of the High Court of Justice of England.


Yours faithfully
For and on behalf of
[insert name of Requestor]
The Requestor


_____
Signature

MAERSK BROKER
SHIPBROKERS SINCE 1914

## ANNEX C

STANDARD FORM LETTER OF INDEMNITY TO BE GIVEN IN RETURN FOR SPLITING BILL OF LADING

[insert date]
To : [Name of the Owners]
The Owners of the MN "XXXXXX"

Dear Sirs,
Ship: "XXXXXX" ("the Vessel")
Voyage No.:

Bill of Lading Originally Issued: No.
Date and Place of Issuance:
Cargo:
Loading/Discharging Port:
Shipper:
Consignee:
Notify Address:
Remark:

The above cargo was shipped on the Vessel at the above loading port by the above shipper and consigned to the above consignee for delivery at the above discharge port. We, [Name of the Requestor], hereby request you to split the above Bill of Lading ("the Old B/L") into the following Two sets of the Bills of Lading to be newly issued ("the New Bs/L"), on the condition that we should collect and return all originals of the Old B/L to you before the issuance of the New Bs/L. We confirm that the aggregated quantity of XXXXXX MT of Cargo will not change from the Old B/L to the New Bs/L.

1st New Bill of Lading: No.
Date and Place of Issuance:
Cargo:
Loading/Discharging Port:
Shipper: Consignee:
Notify Address:
Remark:

2nd New Bill of Lading: No.
Date and Place of Issuance:
Cargo:
Loading/Discharging Port:
Shipper: Consignee:
Notify Address:
Remark:
In consideration of your complying with our above request, we hereby agree as follows:-

1. To indemnify you, your servants and agents, the Vessel, her Master and crewmembers ("the Vessel Interests") and to hold all of the Vessel Interests harmless in respect of any liability, loss, damage or expense of whatsoever nature which you may sustain by reason or in any way connected with the issuance of the New Bs/L in accordance with our request.

2. In the event of any proceedings being commenced against any of the Vessel Interests in any way connected with the issuance of the New Bs/L as aforesaid, to provide you or them on demand with sufficient funds to defend the same.

3. If, in any way connected with the issuance of the New Bs/L as aforesaid, the Vessel, or any other ship or property in the same or associated Ownership, management or control, should be arrested or detained or should the arrest or detention thereof be threatened, or should there be any interference in the use or trading of the Vessel (whether by virtue of a caveat

WORKING COPY

being entered on the ship's registry or otherwise howsoever), to provide on demand such bail or other security as may be required to prevent such arrest or detention or to secure the release of such ship or property or to remove such interference and to indemnify you in respect of any liability, loss, damage or expense caused by such arrest or detention or threatened arrest or detention or such interference, whether or not such arrest or detention or threatened arrest or detention or such interference may be justified.

4. The liability of each and every person under this indemnity shall be joint and several and shall not be conditional upon your proceeding first against any person, whether or not such person is party to or liable under this indemnity.

5. Our liability under this indemnity shall continue up to and until any and all of your obligations and liabilities which you may owe by reason of or in any way connected with your complying with our above request, would cease under relevant law(s) of any jurisdiction.

6. We hereby agree and confirm that your complying with our request as aforesaid is always made in your good faith and in reliance upon our assurance that your issuance of the New Bs/L in exchange for all originals of the Old B/L will not prejudice to or impair anyone's right and title to and interest in whole or any part of the above cargo.

7. We shall, in no way, assert that this LOI issued by us shall be null and void for some reason nor raise an issue of invalidity of the LOI in any aspect, in which sense we hereby waive any and all rights, title and interest to so assert and raise the issue at any place or in any occasion.

8. We hereby agree and confirm that neither your acceptance of the LOI nor any fact of your complying with our above request, shall prejudice to any right and defence which you may have under the Charterparty, the bills of lading to be issued thereunder or in law.

9. This indemnity shall be governed by and construed in accordance with English law and each and every person liable under this indemnity shall at your request submit to the jurisdiction of the High Court of Justice of England.

Yours faithfully,
For and on behalf of
[Name of the Requestor]
The Requestor

_____
Signature

THE OWNERS:                                             THE CHARTERERS:

ADM INTERMARE,                                          WESTERN BULK PTE LTD
A DIVISION OF ADM INTERNATIONAL SARL

_____                        _____
Signatory:                                             Signatory:
Position:                                              Position:

CP ID: 205854   CP Date: 28 Apr 2023   Vessel: EASTERN HAWK                          Page 33 of 33